**UNITED STATES of America ex rel. James F. ALDERSON, Plaintiff,**

v.

**QUORUM HEALTH GROUP, INC., et al., Defendants.**

**No. 8:99–CV–413–T–23TGW.**

United States District Court, M.D. Florida, Tampa Division.

Nov. 8, 2001.

**1324**

Jay G. Trezevant, U.S. Attorney's Office, Tampa, FL, Joyce R. Branda, Arnold M. Auerhan, David M. Gossett, Michael F. Hertz, Marie V. O'Connell, U.S. Dept. of Justice, Civil Division, Washington, DC, W. Christian Hoyer, Judy Schropp Hoyer, Christopher C. Casper, James, Hoyer, Newcomer & Smiljanich, P.A., Tampa, FL, Peter W. Chatfield, Phillips & Cohen, Washington, DC, Steven L. Meagher, Phillips & Cohen, San Francisco, CA, for Plaintiff.

Benjamin H. Hill, III, Robert A. Shimberg, David L. Kian, Brett J. Preston, Gregory P. Brown, Hill, Ward & Henderson, P.A., Tampa, FL, William H. Barrett, Charles R. Work, Patrick K. O'Hara, Ankur J. Goel, John G. Horan, Stacey D. Rabbino, William D. Hagedorn, Monte Dube, McDermott, Will & Emery, Washington, DC, Steven A. Maddox, McDermott, Will & Emery, Menlo Park, CA, for Defendants.

## *ORDER*

MERRYDAY, District Judge.

At the conclusion of Court-ordered mediation that persisted for nearly two years, the United States ("United States" or "government") and the relator, James F. Alderson ("Alderson"), settled this False Claims Act[1] ("FCA") action against Quorum Health Group, Inc. ("Quorum").[2] The settlement yielded both a recovery of $85,773,745.81 and implementation of a corporate integrity agreement between Quorum and the United States. The action was dismissed with prejudice on April 24, 2001 (Doc. 154). The Court retains jurisdiction to determine the amount of Alderson's statutory moiety, *i.e.*, the relator's share of the settlement proceeds pursuant to 31 U.S.C. § 3730(d)(1).[3]

Following review of the parties' papers addressing the relator's proper share (Docs.156, 165, 166, 167), the Court held a two-day hearing during which Alderson and the United States presented both testimonial and documentary evidence and offered argument in support of their respective positions.[4] Also, the Court re-

---

1. 31 U.S.C. § 3729, *et seq.*

2. In this order, "Quorum" may also refer to Quorum Health Resources, Inc., a subsidiary of Quorum Health Group, Inc. Distinctions between the two Quorum entities are irrelevant to the matter under consideration.

3. 31 U.S.C. § 3730(d)(1) provides, in pertinent part:
   If the Government proceeds with an action brought by a person under subsection (b), such person shall ... receive at least 15 percent but not more that 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action.

4. Alderson and the United States are the only "parties" for purposes of determining the relator's share of the settlement proceeds. The defendants advance no position with respect to Alderson's share. Of course, the merits of the claims against the defendants are neither litigated nor resolved in this relator's share proceeding.

ceived and reviewed post-hearing briefs (Docs.176, 177). Both the evidence from the hearing and the parties' papers address the percentage of the settlement proceeds to which Alderson is entitled under 31 U.S.C. § 3730(d)(1) and the settlement amount against which Alderson's percentage is applied.

## I. *The History of the Action*

Application of the legal standard governing the relator's share (*i.e.,* the extent of the relator's contribution to the prosecution of the action) necessitates a searching account of the history of this litigation.[5]

### A. Alderson's Initial Investigation and Complaint

Alderson was employed as the Chief Financial Officer of North Valley Hospital in Whitefish, Montana, a job he held for approximately six and one-half years. In August, 1990, Quorum became the management company at North Valley Hospital. Shortly after Quorum assumed control, Clyde Eder, Quorum's district vice-president, informed Alderson of Quorum's policy concerning cost report preparation, which policy required the simultaneous preparation of both an "aggressive" report for submission to Medicare for cost reimbursement and a "reserve" report for submission to Quorum's auditors. Alderson, who was preparing the hospital's Medicare cost report for the fiscal year ending June 30, 1990, refused to prepare the two inconsistent reports. Alderson was summarily

terminated four days later, September 9, 1990.

In May, 1991, Alderson filed a wrongful termination action against Quorum in Montana state court. During discovery in that suit, Alderson deposed certain Quorum officials, whose testimony suggested to Alderson improprieties in Quorum's cost reporting policies. Seizing this lead, Alderson pursued document discovery directed at Quorum's Medicare reimbursement cost reports. Quorum produced a representative sample of reports from nine hospitals located in several western states.[6] Alderson engaged Nicolas Bourdeau ("Bourdeau") to analyze the reports. Bourdeau, whom Alderson had earlier retained for assistance in the wrongful termination suit, is a forensic accountant with Medicare reimbursement expertise. Bourdeau prepared a report on the Quorum Nine that indicated fraudulent cost reporting by Quorum.

Although Alderson, not himself an attorney, was represented by counsel in his wrongful termination action, he initially proceeded *pro se* in the FCA matter and drafted his own *qui tam* FCA complaint in late 1992. On January 5, 1993, Alderson filed a three-count *qui tam* complaint under seal in the United States District Court for the District of Montana. Shortly thereafter, Alderson served copies of his sealed complaint upon the Attorney General and the United States Attorney for the District of Montana in accordance with

---

**5.** The testimonial and documentary evidence submitted at the hearing, conducted on May 31, 2001, and June 1, 2001, elucidated in graphic detail the history of the litigation. The FCA does not compel a hearing to determine a relator's share and courts occasionally render a decision without a hearing if the record is developed sufficiently. *See, e.g., United States ex rel. Burr v. Blue Cross and Blue Shield of Fla., Inc.,* 882 F.Supp. 166, 169

(M.D.Fla.1995). In this instance, however, the opportunity to evaluate live testimony and question well-informed counsel and other participants concerning particulars of the case materially supplemented and clarified the record.

**6.** The parties commonly refer to these hospitals as the "Quorum Nine."

requirements of the FCA and the Federal Rules of Civil Procedure.

## B. Government Intervention

After receiving Alderson's *qui tam* complaint, the United States investigated and evaluated his allegations to determine whether to intervene and assume the initiative in the litigation.[7] Alderson's principal objective was to convince the United States to intervene.[8]

In May, 1993, four months after Alderson filed his complaint, Alderson and Marie O'Connell ("O'Connell"), the Department of Justice ("DOJ") attorney originally assigned to represent the United States, conferred by telephone. During the conference Alderson, still *pro se*, identified for O'Connell and other participating government personnel the categories of documents that the government should subpoena from Quorum to advance most effectively the government's investigation. Alderson's valuable experience obtaining and analyzing the Quorum Nine documents informed his recommendations to O'Connell and her colleagues. Following the conference call, in June, 1993, O'Connell began assembling a team of government lawyers and investigators with pertinent expertise. On June 21, 1993, the United States issued the first of a series of subpoenas. The first subpoena sought Quorum cost reports from 180 hospitals for six years. Additional subpoenas issued in August and Novem-ber, 1993, as the United States expanded the investigation.

In August, 1993, Alderson and Bourdeau traveled, at Alderson's expense, to Washington, D.C., for meetings with O'Connell and other government personnel. Alderson and Bourdeau presented Bourdeau's Quorum Nine analysis, and the United States' lawyers and investigators queried them about the case. However, Alderson returned to Montana without receiving a definitive statement of the United States' position on his case.

At the end of 1993, Alderson engaged Stinson, Mag & Fizzell, a law firm with health care expertise, to represent him in the *qui tam* case. In December, 1993, Alderson, accompanied by counsel, again traveled to Washington, D.C., for an interview with DOJ. This meeting was followed in early 1994 by O'Connell's request that Alderson review some of the documents produced in response to the DOJ subpoenas. Alderson agreed and received eight boxes from DOJ containing cost reports from 197 hospitals for seven years. Alderson, working alone, analyzed the documents, which numbered more than 11,000.[9] He prepared a spread sheet summary of relevant cost reserve information and culled a set of 2,500 documents that corroborated the specific reserve information in the spreadsheet.

Alderson completed his analysis in December, 1994, and Alderson's counsel submitted the work to DOJ in February, 1995.

---

7. The FCA provides that "[i]f the Government proceeds with the action [*i.e.*, intervenes], it shall have the primary responsibility for prosecuting the action ...." 31 U.S.C. § 3730(c)(1). Undoubtedly, Alderson hoped for a swift decision from the United States within the initial sixty-day statutory period allowed for government intervention. 31 U.S.C. § 3730(b)(2). However, the government repeatedly sought extensions of time within which to make an intervention decision pursuant to 31 U.S.C. § 3730(b)(3).

8. The parties agree that government intervention in an FCA case enhances considerably the probability of a recovery.

9. At this time, Alderson was employed full-time at a hospital in Dillon, Montana, where he and his family had moved following his termination from North Valley Hospital. Alderson did the cost report analysis alone at night and on the weekend. Bourdeau did not work on the project, although he continued to contribute to other aspects of the litigation.

However, DOJ told Alderson's counsel that the material Alderson prepared was not copied and distributed to the government lawyers and investigators involved in the case because of demanding schedules. Alderson persisted and instructed his counsel to prepare copies for distribution. Alderson's counsel sent five sets of the spreadsheet and supporting documents to DOJ in March, 1995, and the material was distributed in the latter part of 1995.

During 1994 and 1995, both the United States and Alderson acquired expert assistance from accounting firms. Concurrent with Alderson's work on the eight boxes of documents from the DOJ subpoenas, the United States hired the accounting firms of Figliozzi & Company and Parrish, Moody & Fikes to assist in analyzing the subpoenaed documents and to review Alderson's and Bourdeau's work. At the same time, Alderson's counsel engaged the accounting firm of Heffler, Radetich & Saitta to review Bourdeau's work. Heffler, Radetich & Saitta also analyzed a sample of Alderson's work on the subpoenaed documents. The parties disagree somewhat about the amount of work performed by each accounting firm and the comparative contribution of each to the case. However, the accounting firms largely agreed on the salient analysis and confirmed the accounting irregularities that form the basis for the fraud claims asserted by Alderson and later by the United States.

In November, 1995, concerned that his case was languishing and that decisive government action concerning intervention was not forthcoming, Alderson engaged Phillips & Cohen, a law firm nationally prominent in FCA practice.[10] On December 19, 1995, Steven Meagher ("Meagher")

of Phillips & Cohen's San Francisco office, met in Washington, D.C., with O'Connell and her supervisor, Joyce Branda ("Branda"), to review Alderson's case. Branda and O'Connell, detailing the government's grave reservations about the case, asserted both that the legal basis for Alderson's fraud claims was questionable and that the value of the claim, which they estimated at approximately $10 million, was relatively low.

Notwithstanding the announced skepticism, the United States continued its commitment of significant resources to investigate the matter and obtained from Quorum additional documents, which were analyzed by the government's independent accounting firms, a statistician, and government attorneys and investigators. Unfortunately for Alderson, the United States' view of Alderson's case was unaltered by these efforts. The United States remained skeptical with respect to the validity of the legal theories, the value of the claims, and the quality of the evidence, which the government viewed as poor. The only positive development for Alderson was that in late 1996 and early 1997 Alderson's counsel obtained copies of some, but not all, governmental reports and documents that formed the basis for the government's position.[11]

In mid–1997, O'Connell informed Alderson's counsel that the United States intended to decline intervention. Alderson's counsel were invited on short notice to meet with DOJ attorneys for a formal opportunity to dissuade the government from declination. Alderson's counsel emphasized the inauspicious timing of the proposed declination in the Quorum case. First, Alderson argued that the government's declination against Quorum might

---

10. Stinson, Mag & Fizzell, Alderson's original FCA counsel, withdrew from the case pursuant to an agreement negotiated with Alderson.

11. These documents were disclosed pursuant to an "Agreement Regarding Disclosure of Information" between the United States and Alderson, effective as of December 17, 1996.

reduce the impact of the government's impending execution of search warrants against health care management companies, which warrants were directed at fraudulent billing practices similar to those alleged by Alderson. In other words, Alderson argued that government declination in the Quorum case might foster doubt about the United States' commitment to eliminating fraudulent health care billing practices and embolden investigative targets to oppose rather than cooperate with the government's investigation. Second, Alderson's counsel emphasized that a decision on intervention should be delayed because of an impending motion to transfer Alderson's case from the District of Montana to the Middle District of Florida. Alderson's counsel argued that transfer to the Middle District of Florida, where the United States Attorney was marshaling resources to pursue a group of fraudulent billing cases, might improve the prospects of a recovery in Alderson's case.[12] Alderson's counsel further supported Alderson by presenting a focused summary of the work Alderson had performed on the eight boxes of subpoenaed documents. Alderson, who was living in Boise, Idaho, prepared the summary himself in the rush of events preceding the meeting.[13] As a result of Alderson's timely and concerted advocacy, the United States reluctantly agreed to delay its decision on intervention.

In the summer of 1998, adopting the reasoning of Judge Walker in *United States ex rel. Costa v. Baker & Taylor, Inc.*, 955 F.Supp. 1188 (N.D.Cal.1997), the Court issued an order that directed the United States to declare its decision on intervention by October 5, 1998, and informed the parties that further extensions were unavailable.[14] O'Connell again proposed a meeting with Alderson's counsel but warned that the United States was strongly disposed to decline intervention in Alderson's case.[15] An August 18, 1998, meeting was scheduled.

Before that meeting, Alderson met in San Francisco with Phillips & Cohen, who predicted that DOJ would demand that Phillips & Cohen, on behalf of Alderson, assume primary responsibility for prosecution of the litigation. Phillips & Cohen further predicted that, absent Phillips & Cohen's assuming the burden of lead plaintiffs' counsel, the United States would decline to intervene. Alderson knew that, pursuant to their fee agreement, increased and sustained involvement by Phillips & Cohen would entitle the firm to additional compensation if the case resulted in a recovery. Nonetheless, in consideration of the time and extraordinary effort already committed, as well as the resulting hardship visited on him and his family, Alderson elected to persist and authorized his counsel to accept principal responsibility for the case.[16]

12. The case was transferred to the Middle District of Florida in August, 1997.

13. Over the course of this litigation, Alderson and his family lived in five different cities and three western states. Although Alderson had a stable employment record and family life until 1990, events after his termination from North Valley Hospital, especially his FCA suit, profoundly altered his personal, professional, and financial circumstances, which had a substantial effect on his family.

14. In the interim between the June, 1997, meeting and the summer of 1998, both the

government's attorneys, accountants, and investigators and Alderson's attorneys and accountants continued to develop the case through legal research, forensic accounting, and further investigation.

15. O'Connell apparently had already drafted the DOJ declination letter before the meeting with Alderson's counsel.

16. Among the burdens endured by Alderson was the confidentiality obligation attendant to the sealing of his complaint. By all accounts, during the six years that the seal remained in

At the August 18, 1998, meeting in Washington, D.C., the DOJ attorneys reiterated their skeptical view of Alderson's case citing again the supposedly questionable legal theories, weak evidence, and limited potential recovery.[17] Additionally, as anticipated by Alderson's counsel, DOJ claimed a scarcity of resources to undertake protracted litigation against Quorum. DOJ sought and received assurances from Alderson's counsel of their ability and willingness to commit the necessary resources to the case and to undertake the principal role in prosecuting the litigation. In early October, 1998, pursuant to 31 U.S.C. § 3730(b)(2) and in reliance on the commitment from Phillips & Cohen, the United States intervened in Alderson's case.

## C. Post–Intervention Litigation

In early February, 1999, the United States filed a complaint against Quorum and the other hospital management companies named in Alderson's suit.[18] Following severance of the action against Quorum from the original consolidated case, the United States filed a second complaint (Doc. 1) ("Quorum complaint"). The parties dispute their relative contributions to the composition of the United States' complaints, which are noticeably lengthy and detailed documents supported by voluminous exhibits. Preparation of the complaints unquestionably entailed significant drafting, legal research, and exhibit preparation. DOJ attorneys, assisted by attorneys in other governmental departments, led the initial drafting effort. Alderson's counsel collaborated by reviewing drafts and suggesting modifications. With respect to legal research, DOJ apparently took the initiative and Alderson's counsel completed specific research assignments requested by O'Connell.[19] Both Alderson's counsel and the United States played a significant role in the creation and presentation of the complaints' exhibits.[20] Also contributing substantially to this effort were two auditors, one retained by Alderson and one by the government, each of whom analyzed cost report reserve information and prepared reports that became exhibits to the complaints. Each auditor analyzed roughly half of the pertinent cost reports.[21]

Both parties contributed substantially to the motion practice and discovery that followed the filing of the United States' Quo-

---

effect, Alderson scrupulously adhered to the demands of strict confidentiality.

**17.** At the meeting, Alderson's counsel presented additional analysis of cost reports prepared by one of Alderson's accounting experts. However, the DOJ attorneys apparently found the material unpersuasive.

**18.** Typical of FCA litigation, the United States filed its own complaint after intervention, notwithstanding the earlier filing of Alderson's initial and amended complaints.

**19.** Of course, the parties employed extensive, accumulated legal research compiled by both parties before government intervention, including undoubtedly research completed by Alderson's counsel during the creation of Alderson's first, second, and third amended complaints.

**20.** The exhibits attached to the government's initial complaint were expanded and revised for inclusion in the Quorum complaint.

**21.** In contrast to some of the pre-intervention investigative work, during which the parties often acted independently, much of the work surrounding the preparation of the United States' complaints reveals significant cooperation between the parties. For example, auditors' reports were appended as exhibits to the United States' complaints. To distinguish the pertinent cost items evidencing fraud from legitimate cost items, the parties undertook the arduous task of identifying and highlighting, page by page, individual categories of information contained in the reports. This task was managed principally by Peter Chatfield ("Chatfield"), one of Alderson's attorneys, who directed a team of DOJ paralegals.

rum complaint. Alderson's counsel took the lead in organizing and serving third-party discovery, which included the preparation and service of subpoenas to 200 hospitals throughout the country.[22] Alderson's counsel also took the lead in defeating the defendants' motions objecting to and attempting to limit discovery.

The parties combined their efforts in responding to five motions to dismiss, although the parties responded individually to some of the motions and jointly to others. Alderson's counsel undertook a significant project requiring creation of a new document, a 177-page "Master Claims Guide," which accompanied a joint response to a motion to dismiss challenging inconsistencies in the exhibits to the Quorum complaint.

Approximately concurrent with the third-party discovery directed at the hospitals, the United States led the effort to obtain from "fiscal intermediaries" certain documents that were relevant to the analysis performed by the parties' auditors.[23] That labor, which entailed the receipt and organization of some 600 boxes of documents, was performed largely by DOJ attorneys and paralegals.

### D. The Mediation

The focus of the litigation shifted significantly in mid–1999. The Court referred the case to mediation on March 9, 1999 (Doc. 12). The first mediation conference, conducted by mediator Peter J. Grilli, occurred in Tampa, Florida, on June 11, 1999, and initiated an extraordinary and protracted settlement effort that culminated in dismissal of the case in April, 2001.

Although successful mediation generally proves an efficient method of resolving a dispute (and, indeed, admirably served efficiency in this instance), resolution of the complex and novel issues presented in this case, which was complicated by both the pending collateral litigation and the geographic dispersal of the litigants, required a substantial, sustained exertion from all involved. While, by all accounts, the United States participated meaningfully in all of the mediation conferences, Alderson and his team of attorneys and accountants directed the mediation on behalf of the plaintiffs. This effort included the development by Alderson's accountants of financial analysis before and during the mediation and development by Alderson's counsel of evidence and arguments offered to advance the mediation.[24] Alderson's counsel, principally Meagher and Chatfield, led the negotiation on behalf of the plaintiffs, although the United States appeared at all mediations through Arnold Auerhan, the DOJ attorney who replaced O'Connell as the lead government counsel in mid–1999. Finally and not insignificantly, Alderson himself attended and participated in all of the mediation conferences, which with the exception of the initial conference in Tampa were conducted in Washington, D.C.

Both Alderson and the United States expended thousands of attorney, accountant, and investigator hours on this FCA litigation.[25] Over the case's duration, numerous attorneys and paralegals, both

---

**22.** Phillips & Cohen hired two new associate attorneys to coordinate the discovery effort.

**23.** A fiscal intermediary contracts with the government to receive, audit, and settle cost reimbursement reports submitted by hospitals.

**24.** Bourdeau, who had been associated with Alderson's FCA case since its inception, con-tinued to work with Alderson during the mediation, as did George Saitta, whose firm had been involved with the case since 1994.

**25.** Pursuant to 31 U.S.C. § 3730(d)(1), fees and costs generated by Alderson's counsel, totaling some $2.7 million, were paid by the defendants as part of the settlement.

governmental and private, as well as several law firms, accountants, auditors, and investigators accomplished projects on discrete portions of the litigation. The formidable scope of the case, the amount in controversy, the time and effort expended, and the comings and goings of the many who touched this litigation tend to obscure the fact that one person, James Alderson, participated fully in virtually every aspect of the case from beginning to conclusion.

## II. *The Relator's Share*

Although unusual in a number of respects, the parties agree that this case is, for purposes of determining the relator's share, a "standard" *qui tam* action in which Alderson is entitled to not less than fifteen nor more than twenty-five percent of the settlement proceeds pursuant to 31 U.S.C. § 3730(d)(1).[26] The FCA provides without elaboration that an award within the applicable range shall be based upon "the extent to which the person substantially contributed to the prosecution of the action." 31 U.S.C. § 3730(d)(1).[27]

The parties acknowledge that determination of the relator's share is left largely to the Court's informed discretion. *See United States ex rel. Merena v. Smithkline Beecham Corp.*, 52 F.Supp.2d 420, 449 (E.D.Pa.1998) ("In the final analysis, [determining the relator's substantial contribution] can be no more than a judgment call by the decision maker."), *rev'd on oth-*

er grounds, 205 F.3d 97 (3d Cir.2000). However, several sensible considerations emerge from the FCA's legislative history, the DOJ's internal FCA guidelines, and the case law.

### A. Legislative History

The 1986 amendments to the FCA significantly enhanced the relator's portion of an FCA recovery. *See United States v. Northrop Corp.*, 59 F.3d 953, 963 (9th Cir. 1995), *cert. denied*, 518 U.S. 1018, 116 S.Ct. 2550, 135 L.Ed.2d 1069 (1996). Before 1986, the relator's award in the "standard" *qui tam* action was capped at ten percent of the recovery. *See* 31 U.S.C.A. § 3730(c) (West 1983).[28] Seeking to increase the private resources committed to fraud prosecutions, Congress amended the FCA in 1986, noting that increased rewards for relators "allow and encourage assistance from the private citizenry [that] can make a significant impact on bolstering the Government's fraud enforcement effort." S.Rep. No. 99–345, at 8 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5273. *See also United States ex rel. Barajas v. Northrop Corp.*, 258 F.3d 1004, 1012 (9th Cir.2001) (clear statutory scheme "designed to help fight fraud against the government by encouraging private individuals to come forward with information about fraud that might otherwise remain hidden.").

The fifteen percent minimum share is generally viewed as a finder's fee.[29] With

---

**26.** *See* John T. Boese, *Civil False Claims and Qui Tam Actions* § 4.08[A] (2d ed. 2001 Supp.) ("In the 'standard' *qui tam* case, the *qui tam* relator will not have been involved in the wrongdoing, will have filed the case before public disclosure, the government will have intervened in the case, and the relator and [relator's] counsel will have some degree of participation in litigating the matter.").

**27.** The Supreme Court describes the relator's share as "the bounty he will receive if the suit is successful." *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S.

765, 772, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000).

**28.** For a history of *qui tam* actions generally, *see Vermont Agency of Natural Res.*, 529 U.S. at 774–78, 120 S.Ct. 1858. For a history of actions under the FCA, *see United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 649–51 (D.C.Cir.1994).

**29.** The finder's fee concept emerges in the legislative history, in which the fee is characterized as an "incentive[ ] for people to bring information forward[.]" This incentive com-

respect to criteria for awards above the minimum, the text of the FCA is silent, other than directing a consideration of the extent of the relator's substantial contribution to the prosecution of the action. The legislative history of the House version of the 1986 amendments, ultimately adopted as section 3730(d)(1), provides:

> In those cases where the person carefully develops all the facts and supporting documentation necessary to make the case required by law, and where that person continues to play an active and constructive role in the litigation that leads ultimately to a successful recovery to the United States Treasury, the Court should award a percentage substantially above 15% and up to 25%.

132 Cong. Rec. H9382–03 (Oct. 7, 1986) (Westlaw ed.) (statement of Rep. Berman) (the "House factors").

The legislative history of the Senate version, which provided for an award of between ten and twenty percent, identifies the following factors that a court should consider in determining the relator's share:

1. The significance of the information provided to the government by the *qui tam* plaintiff;

2. The contribution of the *qui tam* plaintiff to the result; and

3. Whether the information in the suit provided by the relator was previously known to the government.

S.Rep. No. 99–345, at 28 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5293 (the "Senate factors").[30]

■ Assessed against these criteria, Alderson deserves a robust share of the settlement proceeds. The first House factor and the first Senate factor focus on the significance and development of information. Although the government questions the quality of Alderson's initial disclosures, the significance of the disclosures is indisputable. Admittedly, years passed and an heroic effort by many, including prominently Alderson and the team he assembled, contributed to the development of the factual information, documentary evidence, and legal arguments necessary to prevail. Nonetheless, the weight and importance of Alderson's initial allegations and his knowledge of hospital cost accounting formed the enduring foundation upon which the multi-million dollar recovery stands.

The second House and Senate factors address the *qui tam* plaintiff's contribution to the result. The case history demonstrates clearly that Alderson and his team contributed decisively to nearly every aspect of the case from the initial investigation to the conclusion of mediation.[31] The record establishes beyond question that

---

pensation is paid to a relator "even if that person does nothing more than file the action in federal court." 132 Cong. Rec. H9382–03 (Oct. 7, 1986) (Westlaw ed.) (statement of Rep. Berman). *See also* S.Rep. No. 99–345, at 28 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5293.

**30.** For additional discussion of FCA legislation history, particularly the 1986 amendments, *see* John T. Boese, *Civil False Claims and Qui Tam Actions* §§ 4.08, 4.08[A] (2d ed. 2001 Supp.); *Qui Tam Litigation Under the False Claims Act, Second Edition,* pp. 1–11

(ABA Section of Public Contract Law Procurement Fraud Committee, 1999).

**31.** No material distinction exists between Alderson and his team of attorneys and accountants. In view of the complexity of this case and the realities of typical FCA litigation, a relator could not contribute to the maximum extent without the determined assistance of skilled professionals. To that end, a relator is entitled to retain and compensate essential and specially skilled professionals, an undertaking that in the current market is a manifestly retail engagement.

the United States viewed the case cautiously, if not skeptically, for several years and that, absent Alderson's actions and those of his counsel, the United States would have declined intervention. Indeed, absent the commitment of crucial resources by Alderson and his counsel, which commitment the United States admits was "uncommon" and "unusual" (Hr'g Tr., June 1, 2001, at 174–76), the United States likely would have been forced to decline the case.

The third Senate factor focuses on the government's independent knowledge, if any, of the wrongful conduct alleged by the relator. By its own admission, the United States possessed no awareness from any source of Quorum's practices. Indeed, before Alderson filed his *qui tam* action, the United States had no history of pursuing health care cases exhibiting the fraudulent techniques allegedly employed in this instance.

### B. The DOJ Guidelines

· The DOJ maintains a set of internal "Relator's Share Guidelines," which offer assistance to DOJ attorneys "[w]hen trying to reach agreement with a relator as to his share of the proceeds, or proposing an amount or percentage to a court...." *See* 11 False Claims Act and *Qui Tam* Quarterly Review 17–19 (Oct.1997). Issued in December, 1996, the DOJ guidelines are merely internal standards and not federal regulations.[32] However, the DOJ guidelines are well known among frequent FCA practitioners and apparently often are consulted by the government and relator's counsel in negotiating a relator's share.[33]

More importantly, the DOJ guidelines touch many of the factors that common sense and experience commend in assessing a relator's contribution. The DOJ guidelines, which are avowedly "not exhaustive," are as follows:

Items for consideration for a possible increase in the percentage:

1. The relator reported the fraud promptly.

2. When he learned of the fraud, the relator tried to stop the fraud or reported it to a supervisor or the Government.

3. The *qui tam* filing, or the ensuing investigation, caused the offender to halt the fraudulent practices.

4. The complaint warned the Government of a significant safety issue.

5. The complaint exposed a nation-wide practice.

6. The relator provided extensive, first-hand details of the fraud to the Government.

7. The Government had no knowledge of the fraud.

8. The relator provided substantial assistance during the investigation and/or pre-trial phases of the case.

9. At his deposition and/or trial, the relator was an excellent, credible witness.

10. The relator's counsel provided substantial assistance to the Government.

11. The relator and his counsel supported and cooperated with the Government during the entire proceeding.

---

**32.** Nonetheless, some courts have noted and considered the DOJ guidelines. *See, e.g., United States ex rel. Fox v. Northwest Nephrology Assoc., P.S.,* 87 F.Supp.2d 1103, 1111 (E.D.Wash.2000). However, at least one commentator notes that "these guidelines, for the most part, enjoy neither support in the legislative history nor from court opinions."

James B. Helmer, Jr., *How Great is Thy Bounty: Relator's Share Calculations Pursuant to the False Claims Act,* 68 U. Cin. L.Rev. 737, 757 (2000).

**33.** Both the United States and Alderson cite the DOJ guidelines in their papers.

12. The case went to trial.

13. The FCA recovery was relatively small.

14. The filing of the complaint had a substantial adverse impact on the relator.

Items for consideration for a possible decrease in the percentage:

1. The relator participated in the fraud.

2. The relator substantially delayed in reporting the fraud or filing the complaint.

3. The relator, or relator's counsel, violated FCA procedures:

a. complaint served on defendant or not filed under seal.

b. the relator publicized the case while it was under seal.

c. statement of material facts and evidence not provided.

4. The relator had little knowledge of the fraud or only suspicions.

5. The relator's knowledge was based primarily on public information.

6. The relator learned of the fraud in the course of his Government employment.

7. The Government already knew of the fraud.

8. The relator, or relator's counsel, did not provide any help after filing the complaint, hampered the Government's efforts in developing the case, or unreasonably opposed the Governments' position in litigation.

9. The case required a substantial effort by the Government to develop the facts to win the lawsuit.

10. The case settled shortly after the complaint was filed or with little need for discovery.

11. The FCA recovery was relatively large.

Although including an array of generally pertinent matters, the DOJ guidelines fail to establish a coherent theory under which to determine the relator's share. Notably, the guidelines, or at least some of their underlying premises, contradict one another.[34] Nonetheless, the DOJ guidelines retain some influence. For example, the guidelines confirm the value of the contribution by a relator's counsel. "Increase" items 10 and 11 and "decrease" items 3 and 8 include an explicit appraisal of the role of the relator's counsel.

The United States asserts that because the defendants have already reimbursed Alderson's counsel for hourly attorney's fees and costs, any present consideration of the contribution of Alderson's counsel would constitute "double consideration of the same effort for two separate recoveries." (Hr'g Tr., June 1, 2001, at 214). However, if measured by the DOJ guidelines, the United States' argument seeking

---

34. For example, item 12 of the list of factors meriting an "increase" assigns value to a trial. This factor sensibly recognizes that a case that is tried typically requires more effort from the litigants than one that terminates before trial. Similarly, "decrease" factor 10 suggests that a quick settlement warrants a lower award to the relator. However, other "increase" factors (including items 1, 6, 8, and 9, for example) recognize the value of a prompt and credible relator with compelling evidence of fraud. The government presumably values a credible relator and compelling evidence because these factors contribute to the strength of the case. Of course, in many instances an undeniably strong case is likely to resolve itself before trial. Thus, the DOJ guidelines financially value (at least implicitly) both the case that settles and the case that results in trial. The DOJ guidelines suffer other theoretical problems and are noticeably unhelpful. In effect, the DOJ guidelines are merely an indiscriminate enumeration of more or less obvious factors, unaccompanied by any indication of comparative weight and more useful as a checklist for negotiation than a rule of decision in an adjudication.

to diminish or eliminate consideration of the contributions by Alderson's counsel is unavailing. Of course, this does not mean that Alderson deserves a large relator's share simply because his counsel expended thousands of hours on this case. The quality of counsel's assistance predominates over its quantity. The record establishes that Alderson's counsel contributed significantly (in both quality and quantity) and at certain moments crucially to this case. That contribution deserves manifest and telling weight in determining the proper relator's award.[35]

Although equivocal and somewhat unresponsive to the particulars of this case, the DOJ guidelines, fairly applied, suggest forcefully that Alderson is entitled to a robust share of the settlement proceeds.[36] Alderson's conduct and the history and characteristics of the case satisfy "increase" items 1, 2, 3, 5, 7, 8, 10, 11, and 14, while only "decrease" items 9 and perhaps 4 and 11 apply.[37]

35. The United States asserts that an enhanced award to Alderson will result in a windfall for his current and former counsel because of contingent fee agreements, which tend to compensate abundantly if a party recovers abundantly. The law generally accepts contingent fees (and hybrid contingent and hourly fees) as a tool that provides litigants access to the courts, unavailable by other means of compensation. Contingent fees also offer an opportunity to proportion risk and reward. Of course, in FCA cases Congress has statutorily resolved to compensate a relator by resort to a percentage of the recovery and without reference to hourly compensation, actual costs, or prevailing market rates. A relator is at liberty to compensate his counsel in accord with the legislative framework of percentages. In other words, to obtain the necessary professional advice and assistance, Alderson remains free to distribute his recovery as he sees fit (subject to the lawyer's ethical obligations to charge a reasonable fee) and the matter is of no moment to the United States. In fact, the congressional scheme compensating relators by a range of percentages of the gross recovery inherently promotes compensation that exceeds normal market rates of compensation as measured by dollars per unit of time (usually per hour). Congress has judged that the public interest in detecting and defeating fraud in the payment of public money deserves and manifestly requires an abundant reward. Stated differently, in allowing for a percentage recovery and the consequent abundant reward to relators, Congress undoubtedly considered that accusations of large scale, systematic, public fraud often engender a highly motivated and especially aggressive defense, which exacts a heavy toll on accusers and their supporters. The FCA ex-

presses Congress' understandable willingness to forbear between 15 and 25 cents per dollar of the recovery in order to reclaim a defendant's ill-gotten gain.

36. Notably, the DOJ guidelines fail to advise explicitly on the effect of a mediation (especially an extraordinarily protracted and complex mediation) on the relator's share. However, in this instance, the mediation assumed an aspect of no less dignity than a typical trial in a similar matter.

37. The United States asserts that the size of the recovery in this case supports a reduced relator's share. The statutory language and the legislative history are markedly silent on this, instead focusing only on the relator and his contribution. Limited judicial opinion suggests that the size of the recovery is largely irrelevant. *Smithkline Beecham Corp.*, 52 F.Supp.2d at 434. Of course, the relative size of a recovery is a somewhat elusive notion, introducing the question, "Compared to what?" In this instance, neither party offers evidence to show whether, for example, in the universe of FCA recoveries, this recovery is small or large. Nor does either party offer evidence to demonstrate the quality of the result (*i.e.*, whether the recovery equals, exceeds, or falls below the reasonable value of the claims alleged by Alderson), although the recovery surpasses considerably the United States' preliminary assessment of $10 million. Congress could have capped the relator's share or established a sliding scale to graduate the available percentages as the size of the recovery increases. Other statutes employ a variety of mechanisms to limit the size of awards to relators, informers, and other persons aiding the United States. *See, e.g.,* 12 U.S.C. §§ 4205(d), 4225(c) (declarant whose

## C. Additional Considerations

A number of characteristics peculiar to this case demand consideration. The participation of Alderson's counsel was unusual in several respects. On at least two occasions, the United States openly signaled its intention to decline prosecution, first in mid–1997 and again in August, 1998. On both occasions, Alderson and his counsel, by reinforced arguments and credible offers of assistance, convinced the United States to persevere.[38] These exertions, which depended for their credibility and force upon the willingness, resources, and persistence of Alderson's counsel, proved crucial to the survival of this litigation, which resulted in a significant recovery to the United States.[39]

As discussed earlier, following government intervention, Alderson's counsel continued their unusually energetic participation. However, the FCA envisions the United States as the motive force in FCA enforcement. 31 U.S.C. § 3730(c)(1) ("If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action ...."). With respect to preparation of the United States' complaints, early discovery, and motion practice, Alderson's counsel assumed a responsibility essentially equivalent to that of the DOJ attorneys (although, again, the statutory assumption is that the United States "shall have the primary responsibility"). With respect to the decisive yet arduous mediation, Alderson's counsel assumed the preeminent role. Nonetheless, the United States strenuously opposes crediting Alderson fully for the contributions by his counsel to resolution of this case. Notwithstanding that objection, the contributions by Alderson's counsel, particularly after government intervention, deserve recognition as the decisive contribution on Alderson's behalf to the prosecution of the action.

The mediation also distinguishes this case from typical FCA litigation. Although mediation often fosters efficient settlement of a case without the inordinate expenditures attendant to trial, court-ordered mediation early in the discovery stage of FCA litigation is unusual, as the parties acknowledge. In this instance, af-

---

information pertaining to violations of laws governing FDIC-insured financial institutions results in recovery to the United States entitled to twenty to thirty percent of the first $1,000,000 recovered, ten to twenty percent of the next $4,000,000, and five to ten percent of the next $5,000,000); 19 U.S.C. § 1619(a)-(c) (informer whose information concerning violations of customs or navigation laws results in a recovery to the United States entitled to twenty-five percent of that recovery, subject to a $250,000 maximum award). Still other enactments establishing a statutory moiety provide simply that the United States and the relator (or his equivalent) shall recover equally, without consideration to the size of the recovery. See, e.g., 18 U.S.C. § 962 (equal shares of vessel privately armed against friendly nations); 25 U.S.C. § 201 (equal shares of recovery against person violating Indian protection laws); 26 U.S.C. § 7341(c) (equal shares of recovery of sale proceeds from fraudulent transfer to avoid tax liability); 35 U.S.C. § 292(b) (equal shares of recovery

against person falsely marking patented articles); 46 U.S.C. § 723 (equal shares of vessel removing undersea treasure to foreign nations). With respect to the FCA relator's share, the conspicuous absence of an explicit cap or a mechanism to taper the available percentage argues forcefully against the government's position that the size of the recovery is a factor warranting consideration. In any event, the role of Alderson and the professionals acting in concert with him overpowers any consideration attributable to the size of the recovery.

38. Had the United States declined to intervene, Alderson could have pursued his case alone pursuant to 31 U.S.C. § 3730(c)(3). However, both parties recognize that the prospect of recovery in a non-intervened case is dramatically reduced.

39. Notably, the case settled for more than eight times the $10 million estimate assigned to the case by the United States in late 1995.

ter transfer of the action from Montana, this Court ordered mediation.[40] Although pending for four and one-half years in Montana, the action was unusually immature at the time of transfer because of the United States' extended indecision on intervention. Therefore, the mediation order, although entered in the seventh year of the action, occurred in the early stage of discovery, just one month after the Quorum case was severed from Alderson's original consolidated action.

Instead of proceeding through formal discovery and trial, the parties experienced an almost parallel path of voluntary exchange of information and complicated negotiation, which resulted in a settlement. The exertion of the parties and their counsel was scarcely less vigorous and combative than a trial of the same action.[41] In short, an appraisal of the aggregate effort in this action results in the conclusion that the parties and their counsel persisted in a manner and to an extent fairly approximating a trial in the typical FCA case.

Some courts have asserted that a relator who endures a trial deserves an enhanced share of the recovery. *See, e.g., United States ex rel. Coughlin v. Int'l Bus. Mach. Corp.*, 992 F.Supp. 137, 142 (N.D.N.Y. 1998).[42] However, other courts reject this view. *See, e.g., United States ex rel. Pedicone v. Mazak Corp.*, 807 F.Supp. 1350, 1353 (S.D.Ohio 1992) ("This Court does not find any support for the government's position that the *qui tam* Plaintiff's share

should differ depending upon whether the case is settled or tried."). In this instance, the mediation was neither quick nor uneventful. The litigants engaged each other on the issues in exacting detail and at excruciating length. Claims and defenses were debated by skilled and determined combatants. Alderson endured nearly two years of mediation, crossing the country repeatedly in the process. In other words, without respect to whether a mediation of this magnitude and duration is precisely equivalent to a trial, the mediation in this instance required the parties, including especially Alderson and his counsel, to marshal and deploy the legal, financial, physical, and psychological resources typical of a trial in federal court. Alderson's share of the proceeds should not lessen because this exemplary effort in dispute resolution was a success.

Finally, the Court attaches much importance to the oppressive burden borne by Alderson in initiating and sustaining his case. *United States v. NEC Corp.*, 11 F.3d 136, 138–39 (11th Cir.1993), recognizes the emotional strain and financial burdens attendant to pursuing a *qui tam* action and confirms that the relator's share is intended, in part, to "compensat[e] the relator for the substantial time and expense involved in bringing a *qui tam* action" and for his "time and trouble." *See also, United States ex rel. Burr v. Blue Cross and Blue Shield of Fla., Inc.*, 882 F.Supp. 166, 169 (M.D.Fla.1995) ("A

---

**40.** In January, 1993, Alderson filed his *qui tam* action in the District of Montana naming as defendants Quorum, Hospital Corporation of America, HCA Management Co., Health Trust–The Hospital Co., and all hospitals owned or managed by those parties since January 1, 1985. The action was transferred to the Middle District of Florida in August, 1997. Alderson's action against Quorum was severed from the other litigation in February, 1999. The Quorum case was referred to mediation in March, 1999.

**41.** The success of this mediation is undoubtedly due in large part to the patient yet resolute effort of the mediator, Peter J. Grilli, who once again has resolved a daunting dispute, notwithstanding the prohibitive odds against a successful mediation.

**42.** If that rationale is accepted and applied, a settlement resulting from a relatively quick and efficient mediation militates against an enhanced relator's share.

relator may be entitled to the statutory maximum percentage in situations where the relator has suffered personal or professional hardship."). Even a cursory review of applicable history demonstrates the formidable personal and legal difficulties encountered by Alderson during and because of this litigation, none of which dissuaded him from promptly disclosing Quorum's alleged fraud and doggedly pursuing his claim. *See United States v. General Elec.*, 808 F.Supp. 580, 584 (S.D.Ohio 1992) ("Awards of the full 25 percent fee should be reserved for only those individuals whose conduct in disclosing the fraud is virtually flawless."). The testimony confirms the disruptive and divisive effect of the litigation on Alderson and his family, including the dispiriting financial hardship and the burden of the confidentiality obligation governing this case.[43] Also, Alderson's history describes a man who often acted alone and without ardent supporters and without the reassurance of others who shared his commitment and his conviction. Only his dogged resolution, eventually supported by competent professionals and an occasionally reluctant government, resulted in the millions now available for distribution.

### D. Alderson's Share

The record graphically demonstrates Alderson's profound personal and professional commitment to success in this litigation. His commitment manifested itself in his persistent labors and those of his attorneys and accountants, all of whom contributed mightily both before and after the United States intervened. From the moment of his summary discharge on September 9, 1990, until today, although often acting nearly in isolation and wrestling both lingering doubt and a hesitant but demanding governmental ally, Alderson simply refused to relent. With time (and with no small measure of fortuity), his persistence has prevailed.

Upon consideration of the unusual circumstances of this case, including (1) the extraordinary commitment by Alderson both before and after government intervention; (2) the prominent role of Alderson's counsel both before and after government intervention, particularly during the mediation; (3) the unusual length and complexity of the mediation process; (4) the result of the litigation, which includes a generous recovery to the United States Treasury and the cessation of a previously undetected and allegedly fraudulent nationwide practice; (5) and the hardship endured by Alderson and his family during the course of the litigation, the Court finds that Alderson's contribution to the prosecution of this case has been uncommon, unusual, and exemplary and weighs strongly in favor of a generous relator's share. Accordingly, the Court awards Alderson, in addition to the minimum fifteen percent, an additional nine percent, for a total of twenty-four percent of the settlement proceeds.[44]

---

43. Alderson's involvement in this dispute illustrates vividly Judge Learned Hand's cautionary observation that "as a litigant I should dread a lawsuit beyond almost anything else short of sickness and death." "The Deficiencies of Trials to Reach the Heart of the Matter," 1921, in *Lectures on Legal Topics*, 3:89, 105 (1926).

44. Alderson's counsel advances the argument that the Court in measuring the relator's share should employ a simple rating of Alderson's contribution on a scale of one to ten. That formulation, although appealing, finds little authoritative support and perhaps oversimplifies the evaluation. Nonetheless, although Alderson testified with brave humor that nine is not his lucky number, the Court's evaluation leads to the conclusion that Alderson should score not less than nine on his counsel's proposed scale of ten.

### III. *Portion of Settlement Proceeds*

■ The parties dispute the amount of the settlement proceeds from which the relator's share is computed consequent upon Section 3730(d)(1), which entitles the relator to not less than fifteen percent nor more than twenty-five percent of the "proceeds of the action or settlement of the claim . . . ." The United States asserts that although the case settled for approximately $85.7 million, $5 million of that amount is excluded from the amount against which Alderson's percentage applies. The United States asserts that the $5 million is not "proceeds of the case or settlement of the claim," from which Alderson may recover but is consideration for the release of certain "administrative recoupment claims" putatively unrelated to Alderson's fraud claims.

Paragraph 1 of the settlement agreement, to which the United States and Alderson are signatories, obligates Quorum to:

> pay to the United States the sum of (a) Seventy–Seven Million Five Hundred Thousand Dollars ($77,500,000) plus (b) interest thereon from October 2, 2000 until the Payment Date (as defined below) at the rate of seven and one-quarter percent (7.25%) per annum, compounded quarterly, plus (c) Five Million Dollars (parts (a), (b) and (c) collectively, the "Settlement Amount") . . . .

This paragraph unquestionably prescribes the composition of "the proceeds of the action or the settlement of the claim," and the $5 million contested by the United States is included. Any doubt is textually resolved by the recitation that the "Settlement Amount" equals "(a), (b) and (c) collectively . . . ." In other words, the settlement agreement states the "Settlement Amount" and fails to segregate the claim or claims from which each element of the Settlement Amount derives.

Pursuant to paragraph 8(d) of the settlement agreement, the release excludes claims arising from conduct other than the "Covered Conduct," which according to settlement agreement paragraph C, is defined as "[a]ll of the United States' and Relator's allegations in the Complaint in the [instant action] and in the United States' and Relator's Complaint in the predecessor action, *United States ex rel. Alderson v. Columbia/HCA Healthcare Corporation, et al.,* . . . ." The record in this action fails to establish that the "Covered Conduct" excludes the conduct giving rise to the "administrative recoupment claims." Therefore, for purposes of determining the relator's share, the language of the settlement agreement establishes that the $5 million portion of the settlement is part of the "proceeds of the action or settlement of the claim" in this FCA action.

Citing *United States ex rel. Mayman v. Martin Marietta Corp.,* 894 F.Supp. 218, 225–26 (D.Md.1995), the United States rightly asserts that Alderson does not have a financial stake in every cause of action that the United States pursues against Quorum but only in claims arising under the False Claims Act. However, the evidence is markedly weak in support of the United States' position that the "administrative recoupment claims" supporting the $5 million portion of the settlement derive directly from conduct other than the conduct motivating Alderson's fraud claims. The parties acknowledge that the administrative claims concern "fraud or similar misconduct." The United States introduces no evidence to demonstrate that the conduct in question derives from "similar misconduct" rather than "fraud." [45] Ad-

---

45. The precise distinction between "fraud" and "similar conduct" remains unclear. Although the United States asserts that the possibility of "similar misconduct" rather than "fraud" places the $5 million portion of the settlement beyond Alderson's reach, the United States fails to articulate a meaningful distinction between those categories of conduct or explain its significance in these circum-

mittedly, the United States' insistence on confidentiality with respect to the contents of the mediation and other settlement discussions handicaps a complete understanding in this respect. *Compare Burr,* 882 F.Supp. at 169 (specific findings of the Magistrate Judge concerning the parties' intent and understanding justifies segregating portions of a global settlement for calculating the relator's share).

The United States' effort to exclude the $5 million from the settlement amount is, at best, untimely. Any exclusion of the $5 million should have been manifested in the language of the settlement agreement, especially in view of the extraordinary pains taken in reaching the agreement and the plain language of the "Settlement Amount" provision.[46] Accordingly, upon consideration, the Court finds that the "proceeds of the action or settlement of the claim" includes the full settlement amount of $85,773,745.81.

### Conclusion

Alderson is entitled to $20,585,698.99, which is twenty-four percent of $85,773,745.81.[47]

Somewhat troubling is the adversarial position in which the United States and Alderson find themselves with respect to determination of the relator's share. Alderson tenaciously pursued this cause at substantial personal, financial, and professional cost. Despite some hesitancy painful to Alderson, the United States intervened and the litigation proceeded to a successful conclusion, owing to the collaboration of a group of impressive professionals acting skillfully in concert. The "successful" conclusion of this litigation should result in a sense of satisfaction, at least, for the prevailing parties, Alderson and the United States. Unfortunately, perhaps owing to forces that inhere in the structure of FCA actions, the parties are unable without Court intervention to achieve a resolution of the issues addressed in this order, even after years of splendid and sometimes inspired endeavor.[48]

Congress, rather than the Court, Alderson, or his counsel, decided that a successful FCA relator deserves an abundant portion of the litigation proceeds. The statutory relator's share may appear in some quarters excessive or inequitable, particularly where the total proceeds are relatively large or where the relator's share must be distributed in a manner that rewards parties other than the rela-

---

stances. The FCA plainly covers classic "fraud" as well as similar wrongs, including acts committed in "deliberate ignorance" and "reckless disregard of the truth." 31 U.S.C. § 3729(b).

**46.** The United States may settle an FCA case without the relator's consent. 31 U.S.C. § 3730(c)(2)(B). However, the settlement requires court approval following a fairness hearing and consideration of the relator's objections. In any case, "the government has a duty to advise the relator of the value of the settlement at the time it notifies him that it intends to settle the case ...." *United States ex rel. Thornton v. Science Applications Int'l Corp.,* 207 F.3d 769, 772 (5th Cir.2000).

**47.** The United States shall receive a credit against the amount awarded to account for

the United States' payment already tendered ·to Alderson pursuant to paragraph 10(a) of the settlement agreement.

**48.** Several courts and commentators observe an apparent antagonism between the United States, on the one hand, and relators and their counsel on the other. *See, e.g., General Elec.,* 808 F.Supp. at 584; Marc S. Raspanti & David M. Laigaie, *Current Practice and Procedure Under the Whistleblower Provisions of the Federal False Claims Act,* 71 Temp. L.Rev. 23, 48–52 (1998) (summarizing cases). In this instance, the evidence reveals neither ill will nor bad motive by any participant in this dispute concerning the relator's share. *See Thornton,* 207 F.3d at 773 (recognizing the divergence of otherwise aligned interests when the relator's share must be paid).

tor himself. However, Congress has chosen a mechanism calculated to encourage potential relators to undertake the risk and enervating hardship often attendant to FCA litigation. In this instance, Alderson took up the risk of litigating against prohibitive odds, persevered with his case under excruciating circumstances, and performed a distinctive and admirable service to his country, precisely as Congress intended in enacting the FCA. Under the circumstances, a relator's share of twenty-four percent is equitable, just, and consistent with both the letter and the spirit of the governing statute.