**UNITED STATES of America ex rel. Norman RILLE and Neal Roberts, Plaintiff**

v.

**HEWLETT–PACKARD COMPANY, Defendant.**

**No. 4:04CV00989–BRW.**

United States District Court, E.D. Arkansas, Western Division.

March 18, 2011.

Craig H. Johnson, Lon D. Packard, Packard, Packard & Johnson, Salt Lake City, UT, Daniel W. Packard, Jacquetta F. Bardacos, Ronald D. Packard, Von G. Packard, Packard, Packard & Johnson, Jeffrey Wexler, Luce, Forward, Hamilton & Scripps, Los Altos, CA, Michael Bierman, Luce, Forward, Hamilton & Scripps, Ryan S. Mauck, Stanley M. Gibson, Jeffer Mangels Butler & Mitchell LLP, Los Angeles, CA, Shirley Guntharp Jones, Stephen C. Engstrom, Wilson, Engstrom, Corum & Coulter, Little Rock, AR, Timothy Lloyd Brooks, Warner H. Taylor, Taylor Law Partners, Fayetteville, AR, for Plaintiff.

### ORDER

BILLY ROY WILSON, District Judge.

Pending is Relators' Motion for Determination of Relators' Share of Settlement Proceeds (Doc. No. 102). The Government has responded,[1] and Relators have replied.[2] The Motion is GRANTED in part and DENIED in part, as set out below.

## I. BACKGROUND

### A. Procedural History

Norman Rille and Neal Roberts ("Relators") filed this *qui tam* action, along with several others, on September 17, 2004.[3] Their Second Amended Complaint brought claims on behalf of the United States Government (the "Government") against Defendant Hewlett–Packard Company ("HP") and others[4] who provided information technology services and products to the Government, alleging violations of the False Claims Act ("FCA"), the Anti–Kickback Act, and other laws. The Government filed its supplemental notice of election to intervene on April 12, 2007,[5] and filed its Complaint in Intervention the same day.[6]

After numerous stays during the lengthy settlement negotiations, HP and the Government filed a Stipulation of Dismissal in August 2010.[7] Under the settlement agreement, the Government's claims against HP were divided into two categories: (1) kickback claims; and (2) defective pricing claims related to General Services Administration ("GSA") contract number GS–35F–0066N.[8] HP agreed to pay the Government $9 million to resolve the kick-

1. Doc. No. 127.

2. Doc. No. 134.

3. Doc. No. 1.

4. The other Defendants included Accenture LLP and Accenture Ltd., which were severed, transferred, and consolidated in Case No. 4:04CV00985–BRW in October 2007 (Doc. No. 60).

5. Doc. No. 42.

6. Doc. No. 43.

7. Doc. No. 95.

8. *Id.*

back claims and $46 million to resolve the claims related to disclosure and defective pricing under the GSA contract.[9] In January 2011, I denied the Government's motion seeking a determination that Relators were not proper relators as to the defective pricing settlement and could not receive a relators' share of that portion of the settlement.[10]

### B. Relators' Contributions

Relator Rille learned of the violations set forth in the Relators' complaints through his employment with NCR and, later, Accenture. While working at Accenture, Rille learned of and obtained documentation regarding Accenture's "Alliance" relationships[11] with many companies, including HP. He left Accenture with over 700,000 pages of electronic data, including thousands of pages related to the alliance with HP.

Relator Roberts was formerly a partner with Coopers & Lybrand, which became PricewaterhouseCoopers. He investigated Alliance relationships, including speaking with partners of Government contractors and creating a list of Government contractors that engaged in the kickback scheme.[12]

Relators' Second Amended Complaint[13] asserted an industry-wide system of Alliance agreements between systems integration consultants and resellers and others dealing in computer equipment and software. Relators alleged Alliance members were paying and being paid kickbacks in the form of rebates, discounts, and other forms of compensation in return for recommendations or assistance in obtaining federal contracts. Relators also alleged that defendants failed to provide the Government with accurate and complete disclosure of their best pricing.

The Government contends that the information that Relators provided about HP was "generally limited to HP's relationship with Accenture or publicly available on the internet."[14] As the Government points out, neither Relator was an insider at HP. Relators did, however, assist the Government in the prosecution of this case. Counsel for Relators contributed to the drafting of the Department of Energy Office of the Inspector General subpoena, hosted meetings with the DOJ and investigators, helped review documents, and developed—at considerable expense—a database (the Ringtail system) of documents and provided IT support. While counsel will be compensated for their time and costs, I do take into consideration the risk undertaken in expending $310,000 on this database with no guarantee of recovering that amount.

## II. STANDARD

Under the FCA, relators are entitled to a 15% to 25% share of the settlement proceeds when the Government proceeds with an action brought by the relators.[15] The percentage that should be awarded within this range depends upon "the extent to which the [relator] substantially contributed to the prosecution of the action."[16]

9. *Id.*

10. Doc. No. 125.

11. These relationships have several names, but for purposes of this Order they will be referred to simply as Alliances or Alliance partnerships.

12. Doc. No. 35–3, Exhibit N.

13. Doc. No. 35.

14. Doc. No. 127, at p. 6.

15. 31 U.S.C. § 3730(d).

16. *Id.*

The statute itself provides no further guidance for determining the amount of a relator's share.

Courts considering the amount of a relator's share of settlement proceeds have looked to various sources for guidance, including a Senate Report related to the 1986 amendments to the FCA,[17] the Department of Justice's ("DOJ's") internal FCA guidelines, and the case law.

■ The Senate Report factors are as follows: (1) the significance of the information provided to the government; (2) the contribution of the person bringing the action to the result obtained; and (3) whether the information that formed the basis for the suit was known to the government.[18] The legislative history of the False Claims Amendments Act of 1986 provides:

> If the Government comes into the case, the person is guaranteed a minimum of 15% of the total recovery even if that person does nothing more than file the action in federal court. This is in the nature of a "finder's fee" and is provided to develop incentives for people to bring the information forward. The person need do no more than this to secure an entitlement to a minimum 15%. In those cases where the person carefully develops all the facts and supporting documentation necessary to make the case and presents it in a thorough and

detailed fashion to the Justice Department as required by law, and where that person continues to play an active and constructive role in the litigation that leads ultimately to a successful recovery to the United States Treasury, the Court should award a percentage substantially above 15% and up to 25%.[19]

So, the 15% minimum share is "generally viewed as a finder's fee."[20] The maximum share is reserved for those situations in which the relators have "actively and uniquely assist[ed] the government in the prosecution of the case."[21]

The DOJ guidelines are a list of factors that may be relevant in determining the extent to which Relators "substantially contributed to the prosecution" of this action.[22] The DOJ lists as consideration for an *increase* in the percentage the following factors relevant to the present case: (3) The qui tam filing, or the ensuing investigation, caused the offender to halt the fraudulent practices; (5) The complaint exposed a nationwide practice; (6) The relator provided extensive, first-hand details of the fraud to the Government; (7) The Government had no knowledge of the fraud; (8) The relator provided substantial assistance during the investigation and/or pretrial phases of the case; (10) The relator's counsel provided substantial assistance to the Government; and (11) The relator and his counsel supported and cooperated with

**17.** *United States ex rel. Alderson v. Quorum Health Group, Inc.*, 171 F.Supp.2d 1323, 1332 (M.D.Fla.2001) (citing S.Rep. No. 99–345, at 28 (1986), U.S. Code Cong. & Admin. News 1986, p. 5266).

**18.** *Id.*

**19.** 132 Cong. Rec. H9382–03.

**20.** *U.S. ex rel. Alderson v. Quorum Health Group, Inc.*, 171 F.Supp.2d 1323, 1331 (M.D.Fla.2001) (citing legislative history).

**21.** *U.S. ex rel. Johnson–Pochardt*, 252 F.Supp.2d at 897 (quoting *U.S. ex rel. Burr v. Blue Cross & Blue Shield of Florida, Inc.*, 882 F.Supp. 166, 168 (M.D.Fla.1995)).

**22.** They are not definitive factors that a court must follow, and they have been subject to criticism. See *U.S. ex rel. Johnson Pochardt v. Rapid City Regional Hosp.*, 252 F.Supp.2d 892, 900 (D.S.D.2003) (citing *U.S. ex rel. Alderson v. Quorum Health Group, Inc.*, 171 F.Supp.2d 1323 (M.D.Fla.2001)).

the Government during the entire proceeding.

DOJ guidelines for consideration of a possible *decrease* in the percentage include the following: (4) The relator had little knowledge of the fraud or only suspicions; (9) The case required a substantial effort by the Government to develop the facts to win the lawsuit; and (11) The FCA recovery was relatively large.

## III. DISCUSSION

Here, Relators contend that they are entitled to an award in the upper end of the range; the Government argues that Relators are entitled to no more than the minimum (15%) for the defective pricing settlement and the lower end of the range (15–20%) for the kickback settlement.

### A. Kickbacks

■ I will consider the following facts in deciding the amount of the Relators' share: Relators provided 700,000 pages of incriminating documents that Mr. Rille took from Accenture[23]; before Relators notified the Government and filed their Complaint, the Government had no knowledge of any wrongdoing by HP; Relators' counsel hosted meetings and provided tutorial materials for the Government investigators; and HP changed its practices after the suit was filed by lowering its GSA prices by

10%, saving the Government millions of dollars. These factors indicate a substantial contribution by Relators and their counsel.

On the other hand, the information Relators provided about HP was generally limited to the HP–Accenture relationship. Also, the Government's own investigation was extensive and went well beyond that information provided by Relators.

■ This is not a maximum recovery case, but Relators are entitled to an award above the lower end of the range. The lower end of the range is generally appropriate for Relators who have failed to substantially contribute to successful resolution of the case[24] or have hindered its investigation.[25] Based on the above factors, I find that Relators are entitled to 21% of the $9 million in kickback settlement proceeds.

### B. Defective Pricing

■ The Government maintains that the settlement of defective pricing on contract GS-35F-0066N was based on information from OIG subpoenas and information provided by HP, not anything provided by Relators. On February 28, 2007, HP informed the Government that it had hired outside consultants to evaluate whether it had complied with its pricing obligations to the GSA.[26] HP gave the Government the

---

**23.** The Government seeks to minimize the value of the documents, and also claims that the documents were not made available to the Government until after the Government intervened. I note that the information that Relators provided was sufficient to convince the Government to investigate and then intervene in the case.

**24.** *E.g., U.S. ex rel. Burr v. Blue Cross and Blue Shield of Florida, Inc.,* 882 F.Supp. 166, 169 (M.D.Fla.1995) (Court awarded statutory minimum where Relator initiated suit, but her contribution to settlement was "minimal at best").

**25.** *E.g., U.S. ex rel. Coughlin, et al. v. Int'l Bus. Machs. Corp.,* 992 F.Supp. 137, 142 (N.D.N.Y.1998) (Relators' delay in reporting the fraud, hindering the investigation by opposing the government's motions for extension of the seal to continue the investigation, and vigorous opposition to the settlement led the court to award the statutory minimum share).

**26.** Doc. Nos. 112–1; 127–4.

results of its review in 2008. Relators appear not to have been a part of the ensuing investigation. Nevertheless, it is clear that HP would not have initiated this investigation had Relators not filed this law suit. It is no coincidence that HP began its internal investigation just a few weeks after the seal was partially lifted so that a copy of Relators' Complaint could be provided to HP.

Many of the factors discussed for the kickback portion of the settlement apply here as well. In sum, Relators and their counsel were fully cooperative with the Government and provided substantial assistance at the beginning stages of this case. The Government had no knowledge of the defective pricing before Relators brought it to light. Nonetheless, the defective pricing claim that was ultimately settled was developed in large measure after the Government intervened, based upon information other than that provided by Relators.

Based on the above, I find that Relators are entitled to 15% of the $46 million settlement for defective pricing.

## CONCLUSION

Relators will receive 21% of the $9 million kickback portion of the settlement ($1.89 million) and 15% of the $46 million defective pricing portion of the settlement ($6.9 million).