**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**J. Michael MAGINNIS; Janet Y.**
**Maginnis, Defendants–**
**Appellants.**

No. 02–35664.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7, 2003.

Filed Jan. 30, 2004.

1180

---

Glen J. MacGrady, MacGrady Law Offices, New Milford, CO, for the defendants-appellants.

Joel McElvain, United States Department of Justice, Tax Division, Washington, DC, for the plaintiff-appellee.

Before: TROTT, FISHER and GOULD, Circuit Judges.

FISHER, Circuit Judge:

In 1991, taxpayer J. Michael Maginnis won $9 million from the Oregon state lottery, payable in 20 annual installments of $450,000. After receiving five such pay-

ments, he assigned his right to the remaining lottery installments to a third party in 1996 for a lump sum payment discounted to $3,950,000. Initially, he reported this lump sum payment as ordinary income on his joint tax return. In 1998, however, he filed a refund claim, arguing that the payment was a capital gain subject to a lower tax rate. The Internal Revenue Service initially granted the refund, but later determined that the lump sum payment was ordinary income, and brought this suit to recover an erroneous refund of income tax. Because we hold that Maginnis received ordinary income, not a capital gain, from the assignment of his lottery right, we affirm the district court's summary judgment in favor of the government.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

Maginnis, his wife and three sons won a total prize of $23 million in the Oregon state lottery in July 1991. They divided the prize among themselves, with Maginnis and his wife each receiving $9 million and their sons dividing the remainder. Maginnis' $9 million share was payable in 20 equal installments of $450,000, paid to Maginnis via an annuity policy purchased by the State of Oregon.

When Maginnis won his prize, Oregon law did not permit a lottery winner to assign his right to future lottery payments to a third party. In 1995, Oregon amended its lottery statute to allow a lottery winner to petition a state court for the right to assign future payments. Or.Rev. Stat. §§ 461.250(7)(a)(B); 461.253 (2003). Under the current statute, a lottery winner may sell his right to future winnings if he petitions the state court for an order

---

1. Although both J. Michael Maginnis and Janet Maginnis, as joint tax-payers, are named appellants, we refer to "Maginnis" instead of "the Maginnises" because J. Michael Maginnis' assignment of his personal share of the lottery prize is at issue. Appellants' briefing also employs this usage.

approving the assignment and ensures that the assignment complies with a number of statutory precautions. Or.Rev.Stat. § 461.253.

In January 1996, Maginnis assigned his right to receive the remaining 15 installments of his lottery prize to the Woodbridge Financial Corporation for a lump sum payment of $3,950,000. Maginnis successfully petitioned the Oregon court to approve his assignment to Woodbridge. Maginnis reported the $3,950,000 payment on his joint tax return for 1996 as ordinary income and paid the full amount of tax liability shown on that return. He also reported the lump sum payment as taxable income for the purposes of state income tax.

Maginnis and his wife filed an amended federal return in 1998 for the 1996 tax year, seeking a refund of $305,043. They claimed that they had realized capital gain, not ordinary income, on the lump sum payment from Woodbridge. The IRS paid this amount back in full, including interest.

On March 20, 2001, the United States filed a complaint in the District of Oregon, asserting that the IRS had erroneously granted Maginnis and his wife a refund for the 1996 tax year. The government claimed that the sale of the lottery right produced only ordinary income, and that Maginnis was judicially estopped from claiming otherwise because of prior arguments in a separate Oregon state case involving the Oregon income tax, in which he characterized the lump sum payment from Woodbridge as ordinary income.[2] Both parties moved for summary judgment. The district court granted the government's motion, noting that "capital gains treatment is not appropriate here because no asset appreciated." (emphasis removed). We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm the district court.

## STANDARD OF REVIEW

A grant of summary judgment is reviewed de novo. *Oliver v. Keller,* 289 F.3d 623, 626 (9th Cir.2002). Viewing the evidence in the light most favorable to the nonmoving party, we determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

## DISCUSSION

### I.

Whether the sale of a lottery right by a lottery winner is a long-term capital gain under the Internal Revenue Code ("I.R.C.") is a novel question of statutory interpretation. Fundamental principles of tax law lead us to conclude that Maginnis' assignment of his lottery right produced ordinary income.

A long-term capital gain or loss is generated when there is a "sale or exchange of a capital asset." 26 U.S.C. (I.R.C.) § 1222(3). A capital asset, in turn, is "property held by the taxpayer (whether or not connected to his trade or business)," subject to several statutory exceptions not relevant here. I.R.C. § 1221.

The definition of capital asset has, however, never been read as broadly as the statutory language might seem to permit, because such a reading would encompass some things Congress did not intend to be taxed as capital gains. For example, an employee's right to be paid for work to be performed in the future is (for some purposes) "property" not subject to any of the enumerated exceptions in I.R.C. § 1221, but it is doubtful that Congress

---

**2.** Because we conclude, as discussed below, that Maginnis received ordinary income on the sale of his lottery right, we do not address the government's judicial estoppel argument.

would intend the sale of a right to future employment income to be taxed as a capital gain. *See* 2 Bittker & Lokken, *Federal Taxation of Income, Estates and Gifts* ¶ 47.1 (3d. Ed.2000)[hereinafter Bittker & Lokken]. If the statutory term capital asset is defined too broadly, taxpayers might use simple accounting devices to convert all ordinary income into capital gains. *See Furrer v. Comm'r,* 566 F.2d 1115, 1117 (9th Cir.1977).

■ To avoid this problem, in a series of cases that have established what is commonly known as the "substitute for ordinary income" doctrine, the Supreme Court has narrowly construed the term capital asset when taxpayers have made transparent attempts to transform ordinary income into capital gain in ways that undermine Congress' reasons for differentially taxing capital gains. "[N]ot everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset" because

> the term 'capital asset' is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year.

*Comm'r v. Gillette Motor Transport, Inc.,* 364 U.S. 130, 134, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960).

■ The Court has instructed that "lump sum consideration [that] seems essentially a substitute for what would otherwise be received at a future time as ordinary income" may not be taxed as a capital gain. *Comm'r v. P.G. Lake, Inc.,* 356 U.S. 260, 265, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958); *see also Holt v. Comm'r,* 303 F.2d 687, 691 (9th Cir.1962) ("The nature of the

right to receive future income as ordinary income does not change into capital gain by the mere receipt of a lump sum in lieu of such future payments.").

However, there are limits to the substitute for ordinary income doctrine, as well. *See United States v. Dresser Indus.,* 324 F.2d 56, 58–59 (5th Cir.1963). Many assets, including common stock, are typically valued on the basis of the present value of their future income stream, so an approach that took the substitute for ordinary income doctrine too far, and defined the term capital asset too narrowly, would hold that no sale of an asset that produces revenue, even common stock, could be taxed as a capital gain. *See id.* at 59 ("The only commercial value of any property is the present worth of future earnings. . . ."). Because we must eschew both an approach that could potentially convert all capital gains into ordinary income and one that could convert all ordinary income into capital gains, we must make case-by-case judgments as to whether the conversion of income rights into lump-sum payments reflects the sale of a capital asset that produces a capital gain, or whether it produces ordinary income. "Unless and until Congress establishes an arbitrary line on the otherwise seamless spectrum between[substitute for ordinary income] transactions and conventional capital gain transactions, the courts must locate the boundary case by case, a process that can yield few generalizations because there are so many relevant but imponderable criteria." Bittker & Lokken at ¶ 47.9.5.

■ Maginnis' "lottery right" was his right to future payments from the State of Oregon in return for his lottery win. We hold that this right is not a "capital asset" within the meaning of I.R.C. §§ 1221 and 1222, and that Maginnis therefore received ordinary income from its assignment.[3]

---

**3.** Recent Tax Court decisions have found that      the sale of a lottery right produces ordinary

Two factors are crucial to our conclusion, although we do not hold that they will be dispositive in all cases.[4] Maginnis (1) did not make any underlying investment of capital in return for the receipt of his lottery right, and (2) the sale of his right did not reflect an accretion in value over cost to any underlying asset Maginnis held. We have previously described the importance of these two factors, noting that "[t]he essence of a capital transaction within the tax statutes and decided cases is that the sale or exchange of an asset results in a return of a capital investment coupled with realized gain or loss (as the case might be) which accrues to the investment over a certain period of time." *Holt,* 303 F.2d at 691.[5]

Concerning the first factor, the Supreme Court has indicated that the substitute for ordinary income doctrine will apply when there is no evidence of a sale of an underlying capital investment. *Gillette,* 364 U.S. at 135, 80 S.Ct. 1497 (holding that the right to determine the use to which certain facilities were put was "not something in which [the taxpayer] had any investment" and thus was not a capital asset giving rise to a capital gain.); *P.G. Lake,* 356 U.S. at 265, 78 S.Ct. 691 ("We do not see here any conversion of a capital investment."); *Hort v. Comm'r,* 313 U.S. 28, 31, 61 S.Ct. 757, 85 L.Ed. 1168 (holding that a substitute for ordinary income occurred when "[t]he consideration received . . . was not a return of capital"). Similarly, the Court has

stressed the importance of the second factor, instructing that the substitute for ordinary income doctrine should apply to a transaction "manifestly not of the type which gives rise to the hardship of the realization in one year of an advance in *value over cost* built up in several years, which is what Congress sought to ameliorate by the capital-gains provisions." *Gillette,* 364 U.S. at 135, 80 S.Ct. 1497 (emphasis added).

## A. Underlying Investment of Capital

■ Maginnis made no underlying investment in exchange for a right to future payments. First, Maginnis does not—and cannot—argue that the purchase of a lottery ticket is a "capital investment," the return from which should be treated as a capital gain. *Holt,* 303 F.2d at 691 (treating such "capital investment coupled with realized gain or loss" as the "essence of a capital transaction within the tax statutes"). Lottery prizes are treated by the tax code as gambling winnings, which are taxed as ordinary income.[6] *See* I.R.C. § 165(d); *Comm'r v. Groetzinger,* 480 U.S. 23, 32 n. 11, 107 S.Ct. 980, 94 L.Ed.2d 25 (characterizing a state lottery as "public gambling," in a case treating gambling earnings as ordinary income). The lottery prize would have been taxed at ordinary income rates, reflecting the Revenue Code's general position that gambling winnings are not treated as capital gains.

income for a lottery winner. *Davis v. Comm'r,* 119 T.C. 1, 2002 WL 1446631 (2002); *Boehme v. Comm'r,* T.C.M.2003–81 (CCH 2003) (citing *Davis* ); *Johns v. Comm'r,* T.C.M.2003–140 (CCH 2003) (same); *Simpson v. Comm'r,* T.C.M.2003–155 (CCH 2003) (same).

4. We do not decide whether a purchaser (such as Woodbridge) of a lottery right from a lottery winner who then sells that right to a third party would receive ordinary income or capital gain on that sale.

5. In *Holt,* the taxpayer was a film producer, who received a lump sum payment from Paramount Pictures in exchange for relinquishing his rights to a 25% royalty on the gross receipts from a number of films. *Id.* at 688–89. We held that this lump sum payment was not entitled to capital gains treatment, because "[t]here was no return of a capital outlay. . . ." *Id.* at 691.

6. Wagering losses are deductible from wagering gains, which are in turn taxed as ordinary income. *See* I.R.C. § 165(d).

Therefore, the purchase of a lottery ticket is no more an underlying investment of capital than is a dollar bet on the spin of a roulette wheel.

That Maginnis sold his right to accrued lottery winnings to Woodbridge for a lump sum payment did not somehow create a capital investment. Under Oregon law a person *already entitled* to lottery winnings could petition for a judicial order to convert his lottery winnings into an alienable property interest. *See* Or.Rev.Stat. §§ 461.250(8)(a)(B); 461.253 (2003). Absent such a judicial order—that is, without already having won the lottery—Maginnis could not sell his right to receive future accrued income from his lottery prize. Because Maginnis had no right to an alienable lottery interest until he had already won the lottery, and because he made no capital investment before winning the lottery, no investment of capital was involved in creating the lottery right. Therefore, the assignment of the lottery right is better understood as the pure assignment of a gambling winning, rather than as the assignment of a capital asset, the sale of which could create a capital gain.

## B. Change in Value Over Cost

Because Maginnis did not make any capital investment in exchange for his lottery right—because there was no "cost" in the relevant sense to Maginnis for the right to receive accrued future payments from the Oregon lottery—the money he received for the sale of his right cannot plausibly be seen as reflecting an increase of value above the cost of any underlying capital asset. Although the amount a purchaser such as Woodbridge might pay for the right might be subject to some uncertainty, there was no sense in which the purchase price for the lottery right compensated Maginnis for an increase in value over cost. Therefore, the sale of Maginnis' lottery winning to Woodbridge lacks the requisite "realization of appreciation in val-

ue accrued over a substantial period of time" that is typically necessary for capital gains treatment. *Gillette*, 364 U.S. 130, 134, 80 S.Ct. 1497, 4 L.Ed.2d 1617.

## C. Other Considerations

There is no other reason to believe that Maginnis' lottery right assumed the characteristics of a capital asset such that he could recover capital gain from its assignment. Indeed, Maginnis' sale of his lottery right is almost indistinguishable from the paradigmatic situation in which the substitute for ordinary income doctrine removes a right to future income from the definition of a capital asset, which occurs when a taxpayer assigns his right to future income from employment to a third party for a lump sum. *See Furrer*, 566 F.2d at 1117 (holding that a lump sum payment for the termination of an agency relationship is ordinary income). As explained above, the Revenue Code treats gambling winnings essentially as ordinary income, *see Groetzinger*, 480 U.S. at 32 n. 11, 107 S.Ct. 980, and Maginnis has done no more than sell his gambling winnings to a third party.

Moreover, treating the sale of Maginnis' lottery right as a capital gain would reward lottery winners who elect to receive periodic payments in lieu of a direct lump sum payment from the state, and then sell that payment right to a third party. Those who would do so would receive a tax advantage as compared to those taxpayers who would simply choose originally to accept their lottery winning in the form of a lump sum payment. Nothing in the Revenue Code compels the creation of such a dichotomous system for the taxation of lottery winnings. The purpose of narrowly construing the term capital asset under the substitute for ordinary income doctrine is to "protect the revenue against artful devices" that undermine the Revenue Code's standard treatment of ordinary in-

come and capital gains. *P.G. Lake*, 356 U.S. at 265, 78 S.Ct. 691. That is precisely what Maginnis has attempted here.

## II.

Maginnis argues that whatever our analysis of the nature of his transaction, the substitute for ordinary income doctrine should not apply, and that the sale of his lottery right should be treated as the sale of a capital asset. He claims that the substitute for ordinary income doctrine has been limited to specific fact situations, none of which is present here, and that we must therefore read § 1221 broadly and construe the sale of his lottery right as the sale of a capital asset.

Maginnis claims that *Arkansas Best Corp. v. Comm'r*, 485 U.S. 212, 108 S.Ct. 971, 99 L.Ed.2d 183 (1988), mandates this approach. He reads *Arkansas Best* as having largely invalidated the substitute for ordinary income doctrine, and having limited its application to two circumstances only: first, "carve out" transactions in which the taxpayer retains some underlying interest in the property sold (which we discuss below); and second, rights to future income from personal services, which—according to Maginnis—are not covered by the substitute for ordinary income doctrine at all but fall within § 1221's exclusion of "inventory" from the definition of a capital asset. Other sales of property, he suggests, must be treated as sales of a "capital asset" and therefore treated as capital gains for the purposes of I.R.C. § 1222.

Despite Maginnis' argument, it is certain that *Arkansas Best* did not affect the substitute for ordinary income doctrine's constraints on the construction of the term capital asset. *Arkansas Best* dealt with a different subject entirely: it rejected the "motive" test, under which lower federal courts had excluded some property acquired or held for a "business purpose"

from the definition of capital asset under § 1221. 485 U.S. at 217, 108 S.Ct. 971. The Court expressly held that its decision did not affect the way in which the substitute for ordinary income doctrine modifies the term capital asset. As the Court explained:

> Petitioner mistakenly relies on cases [such as *United States v. Midland–Ross*, 381 U.S. 54, 57, 85 S.Ct. 1308, 14 L.Ed.2d 214 (1965), *Gillette*, *P.G. Lake*, and *Hort* ] in which this Court, in narrowly applying the general definition of capital asset, has "construed 'capital asset' to exclude property representing income items or accretions to the value of a capital asset themselves properly attributable to income," even though these items are property in the broad sense of the word.... This line of cases, based on the premise that § 1221 "property" does not include claims or rights to ordinary income, has no application in the present context.

*Id.* at 217 n. 5, 108 S.Ct. 971 (citations omitted).

■ Regardless of *Arkansas Best*, we shall address the underlying merits of Maginnis' argument about carve out transactions. Maginnis claims that because he sold his *entire* right to the lottery payments (or a "vertical slice"), instead of merely a carve out right to an income stream (or a "horizontal slice," in which he would have retained some underlying interest in the right sold), we must treat the income he received from the sale as a capital gain. We reject this argument, and hold that a transaction in which a taxpayer sells his entire interest in an underlying asset without retaining any property right does not *automatically* prevent application of the substitute for ordinary income doctrine.

Maginnis is correct that transactions in which a tax-payer transfers an income

right without transferring his entire interest in an underlying asset will often be occasions for applying the substitute for ordinary income doctrine.[7] As Maginnis notes, finding a capital gain where a taxpayer sells an income right while retaining a property interest in the underlying asset could encourage "all taxpayers owning stock or income-producing property . . . to convert their ordinary investment income into capital gain." Marvin A. Chirlstein, *Federal Income Taxation* ¶ 17.03 (7th ed.1994). For example, if an owner of common stock could sell his right to dividends without selling the underlying stock and realize a capital gain on that sale, he could escape from the tax code's treatment of stock dividends as ordinary income through a simple accounting device.

This does not mean, however, that the substitute for ordinary income doctrine will apply only where a taxpayer has retained some underlying right in the property interest sold. Such an approach is foreclosed, because we have previously applied the substitute for ordinary income doctrine in cases where the taxpayer has sold a property interest in its entirety. *See Holt,* 303 F.2d at 691 (holding that the sale of an entire interest in royalty rights was a substitute for ordinary income); *Hallcraft Homes, Inc. v. Comm'r,* 336 F.2d 701, 703 (9th Cir.1964) (holding that a substitute for ordinary income existed when taxpayer sold his entire right to receive payments from local water companies).[8] Rather, we must make an independent determination as to whether a transaction presents a suitable occasion for applying the substitute for ordinary income doctrine and narrowly construing the definition of a capital asset.

Here, we conclude that the fact that Maginnis sold his entire interest in his

---

7. The distinction between transfers of income rights and transfers of underlying assets also arises in a different tax law context, which is analytically separate. The distinction between "horizontal" and "vertical" slices of income (or, in Justice Holmes' famous metaphor, the "fruit" and the "tree") dates from *Lucas v. Earl,* 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930). In that case, and in several related cases, the Supreme Court prevented taxpayers from artificially avoiding the graduated progressive rates of the income tax by assigning a right to income to a formally separate party (who in fact constituted a single economic unit) without transferring an underlying property interest. *See, e.g., Lucas,* 281 U.S. at 113–14, 50 S.Ct. 241 (husband assigning one half of future earnings to his wife); *Helvering v. Eubank,* 311 U.S. 122, 125, 61 S.Ct. 149, 85 L.Ed. 81 (1940) (taxpayer assigning right to future insurance renewal commissions to a trust). In each of these cases, the issue was the *person* whose income should be taxed. "The impact of the graduated income tax is eroded when income is split artificially among several entities or over several tax years. The assignment of income doctrine . . . (as formulated in *Lucas v. Earl* ) seeks to recognize 'economic reality' by cumulating income diffused among several recipients through 'artificial' legal arrangements." *Foglesong v. Comm'r,* 621 F.2d 865, 868 (7th Cir.1980). Here, the question is not which person should be taxed, but whether the nature of the income received is ordinary income or capital gain.

8. We applied the distinction between a carve out sale and the transfer of an entire interest in *Metropolitan Building Co. v. Commissioner,* 282 F.2d 592 (9th Cir.1960). In that case, the court granted capital gains treatment to the sale of a lease, noting that the sale was "of the leasehold in its entirety" and that the sale "did not constitute a release or transfer only of the right to future income." *Id.* at 594. However, nothing in *Metropolitan Building* suggests that a carve out transaction is the *only* situation in which the substitute for ordinary income doctrine should apply. Moreover, the *Metropolitan Building* court drew a clear distinction between the liquidation of a right to future income, which it held should be taxed as ordinary income, and the liquidation of an income-producing asset, which it held should be taxed as a capital gain. *Id.* Here, as explained above, there was no liquidation of an underlying capital asset.

lottery winning is not a persuasive reason to treat the sale of that right as a capital gain. Because, as discussed above, Maginnis' lottery right did not reflect an underlying capital investment or an increase in value over cost, and because there is no other compelling reason to treat the assignment of the lottery right as an assignment of a capital asset, we shall apply the substitute for ordinary income doctrine.[9]

### III.

We also reject Maginnis' further argument that he is entitled to capital gains treatment because his lottery right is a "debt instrument" under I.R.C. § 1275. A debt instrument is a "bond, debenture, note, or certificate or other evidence of indebtedness." I.R.C. § 1275(a)(1)(A). Treasury regulations further define a debt instrument as "any instrument or contractual arrangement that constitutes indebtedness under general principles of Federal income tax law." Treas. Reg. § 1.1275–1(d).

■ Maginnis' lottery right did not constitute evidence of indebtedness, and therefore was not a debt instrument. "[A]lthough an indebtedness is an obligation, an obligation is not necessarily an 'indebtedness....'" *Deputy v. du Pont,* 308 U.S. 488, 497, 60 S.Ct. 363, 84 L.Ed. 416 (1940). Interest on indebtedness is "compensation for the use or forbearance of money." *Id.* at 498, 60 S.Ct. 363. One "must actually secure the use or forbearance of money and pay interest therefor" to create an indebtedness as defined in the Revenue Code. *Norton v. Comm'r,* 474 F.2d 608, 610 (9th Cir.1973). Here, Maginnis received his right to payments from the state of Oregon as a prize, not as any compensation for the use or forbearance of money, and therefore the lottery right did not constitute evidence of an indebtedness from Oregon to Maginnis.[10]

### *CONCLUSION*

For the reasons stated above, we conclude that the sale of Maginnis' lottery right should be taxed as ordinary income.

---

**9.** Maginnis also claims that his lottery right must be a capital asset because it is an "account receivable" under I.R.C. § 1221. We conclude that this interpretation is not supported by § 1221. The only relevant mention of an account receivable is an exception to the broad definition of a capital asset. I.R.C. § 1221(a)(4) (excluding accounts receivable "acquired in the ordinary course of trade or business for services rendered or from the sale of [certain] property.") Nothing in the statute, however, suggests that this exception implies that accounts receivable that are *not* "for personal services or acquired in the ordinary course of trade or business for services rendered or from the sale of [certain] property" will *automatically* be considered as capital assets. Although some accounts receivable not covered by § 1221(a)(4)'s exception will be capital assets, under the substitute for ordinary income doctrine, some will not be capital assets. Assuming without deciding that Maginnis' lottery right was an account

receivable, that fact does not affect our analysis.

**10.** Other circuits have sometimes found an "indebtedness" to exist even where the underlying obligation was formally gratuitous. However, even in these cases the indebtedness involved the use or forbearance of money. *Comm'r v. Park,* 113 F.2d 352, 354 (3d Cir.1940) (holding that an enforceable note, given by a husband to his wife under seal, constituted an indebtedness, where a husband's gratuitous promise to pay wife a fixed amount of interest arose from wife's promise not to demand payment on the entire note); *Preston v. Comm'r,* 132 F.2d 763, 765 (2d Cir.1942), *superseded by state statute,* N.Y. Gen. Constr. Law § 44–a (McKinney 2003) (noting that a gratuitous obligation was an indebtedness, where a man gratuitously promised under seal to pay interest on a note, after transferring both the underlying amount borrowed on the note and the promise to repay the principal to a trust company).

The district court correctly granted the government summary judgment.

**AFFIRMED.**