T.C. Memo. 2006-240

UNITED STATES TAX COURT

ROLAND AND MARIE WOMACK, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ANASTASIOS AND MARIA SPIRIDAKOS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 13434-03, 19829-03.    Filed November 7, 2006.

We consider two test cases that involve the purely
legal question of whether gain from the sale of the
right to receive future annual lottery payments is
taxable as ordinary income or capital gains.  This
Court and three Courts of Appeals have consistently
held that gain from such a sale is taxable as ordinary
income.  R relies on established precedent, and Ps
contend, as a matter of law, that prior opinions on
this question are in error.  Ps advance four categories
of legal arguments, as follows:  (1) Lottery rights are
capital assets because they are denominated "accounts
receivable" under the Florida Uniform Commercial Code
and, as such, are not in the category "business
accounts receivable" so as to be excluded from the
statutory definition of capital asset under sec.
1221(a)(4), I.R.C.; (2) the substitute for ordinary
income doctrine (doctrine) has been misinterpreted by

the courts with respect to its origins and application to the sale of a lottery right; (3) to the extent that the doctrine continues to have vitality, the Supreme Court's holding in Ark. Best Corp. v. Commissioner, 485 U.S. 212 (1988), by establishing a definitive analysis or test has limited the effect of the doctrine; and (4) a lottery right falls within the definitions of a "debt instrument" and a "bond" under secs. 1275 and 1286, I.R.C., respectively, and its sale would result in capital gain.

Held: Ps have failed to show that established legal precedent is in error, and the gains are taxable as ordinary income.

Steven M. Kwartin, for petitioners.

Timothy Maher, for respondent.

MEMORANDUM OPINION

GERBER, Judge: These consolidated cases are part of a larger group of cases[1] all with the common legal issue of whether gain from the sale of a right to receive future annual lottery payments is taxable as capital gain or as ordinary income. Respondent issued separate notices of deficiency to petitioners in the above-captioned cases determining the following income tax deficiencies:

---

[1] There are 57 related cases in the group that were not consolidated for trial, briefing, and opinion with the above-captioned cases. The parties in the 57 related cases have agreed to be bound by the outcome of these consolidated cases.

| Petitioners | Year | Deficiency |
|-------------|------|------------|
| Roland & Marie Womack | 2000 | $235,852 |
| Anastasios & Maria Spiridakos | 2000 | [1]425,678 |

[1] For the Spiridakoses' 2000 tax year, respondent also determined that because of their failure to timely pay the amount shown as tax on the return, they were liable for an addition to tax under sec. 6651(a)(2), but the amount was left for computation at a later date.

All section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

## Background

Roland and Marie Womack--The Womacks resided in Hilliard, Florida, at the time their petition was filed. On or about January 20, 1996, Roland Womack won a portion of an $8 million prize from the Florida State Lottery. Consequently, he became entitled to receive 20 annual $150,000 payments, less mandatory Federal withholding tax, from the Florida State Lottery. The first payment was scheduled for January 20, 1996, and 19 subsequent installments were to be made on February 15 of each successive year. Mr. Womack paid $1 to purchase his lottery ticket, which entitled him to participate in the biweekly Florida State Lottery drawing. The selection of the number on his lottery ticket entitled him to a share of that drawing's jackpot.

Some of the money received by the Florida State Lottery is invested in U.S. Treasury zero coupon bonds that, upon maturity, provide the funding to pay lottery winners. The Florida State Lottery is both owner and beneficiary of the investments used to fund payments to lottery winners. The Florida State Lottery did not offer winners the option of a lump-sum payment at the time Mr. Womack won the lottery. Under Florida law, Mr. Womack was required to obtain the approval of the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, to transfer his right to receive future lottery winnings.

On or about November 10, 1999, Mr. Womack entered into an agreement with Singer Asset Finance Co., L.L.C. (Singer), to sell and assign all of his remaining rights to receive his 16 remaining annual lottery payments in the gross stated amount of $2.4 million, payable in annual installments through the year 2016. In exchange for Mr. Womack's agreement to assign his remaining lottery installments, Singer paid him a lump sum of $1.328 million during the year 2000. Mr. Womack obtained the approval of the Florida Circuit Court in the form of a court order dated December 5, 1999. The Florida State Lottery confirmed receipt of the court-approved assignment on December 9, 1999.

The Womacks reported the first four $150,000 lottery installment payments for 1996 through 1999 as ordinary income on

their Forms 1040, U.S. Individual Income Tax Return.  On their Form 1040 for 2000, the Womacks reported, on Schedule D, Capital Gains and Losses, the $1.328 million received from Singer as long-term capital gain from the sale of a capital asset.

Anastasios and Maria Spiridakos--The Spiridakoses resided in Clearwater, Florida, at the time their petition was filed.  On or about January 6, 1990, Maria Spiridakos won a $6.24 million prize from the Florida State Lottery.  Consequently, she became entitled to receive 20 annual $312,000 payments, less mandatory Federal withholding tax, from the Florida State Lottery.  The first payment was scheduled for March 7, 1990, and 19 subsequent installments were to be made on February 15 of each successive year.  Mrs. Spiridakos paid $1 to purchase her lottery ticket, which entitled her to participate in the biweekly Florida State Lottery drawing.  The selection of the number on her lottery ticket entitled her to a share of that drawing's jackpot.

The Florida State Lottery did not offer winners the option of a lump-sum payment at the time Mrs. Spiridakos won the lottery.  Under Florida law, Mrs. Spiridakos was required to obtain the approval of the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, to transfer her right to receive future lottery winnings.

On or about July 28, 1999, Mrs. Spiridakos entered into an agreement with Singer to sell and assign all of her remaining

rights to receive the 10 remaining annual lottery payments in the gross amount of $3.12 million, payable in annual installments through the year 2010. In exchange for Mrs. Spiridakos's agreement to assign her remaining lottery installments, Singer paid her a lump sum of $2.125 million during the year 2000. Mrs. Spiridakos obtained the approval of the Florida Circuit Court in the form of a court order dated September 27, 1999.

The Spiridakoses reported the first 10 $312,000 lottery winnings installment payments for 1990 through 1999 as ordinary income on their Forms 1040. On their Form 1040 for 2000, the Spiridakoses reported $2,124,600 on Schedule D as proceeds from the sale of a capital asset and $2,124,599 as long-term capital gain after reduction by the $1 basis (cost of the lottery ticket).

The Spiridakoses filed their Form 1040 for 2000 on November 5, 2001. They had requested and received an extension until October 15, 2001, to file their 2000 return. Because they failed to timely pay the amount shown as tax on their 2000 return, respondent determined an addition to tax under section 6651(a)(2). The Spiridakoses filed an amended Form 1040 for 2000 on or about January 13, 2002.

## Discussion

These consolidated cases present a question that this and other Federal courts have consistently decided for the

Government. The precise question is whether gain from the sale of the right to receive future annual lottery payments is taxable as ordinary income or as capital gain. It has been held that gain from the sale of such rights is taxable as ordinary income. The facts in the two cases under consideration are alike in every material detail and are also indistinguishable from fact patterns considered by this and other courts that have already decided this question.

Essentially, petitioners in each case won the lottery and, for a time, reported each annual installment payment as ordinary income. At some point, petitioners sold the right to their remaining installment payments and claimed that the resulting gain was reportable as capital gain, rather than ordinary income, as respondent contends. Case precedent has consistently held that the sale of the remaining installments does not convert what would have been ordinary income payments into income taxable as capital gain. Petitioners contend, as a matter of law, that precedent on this question is in error.

Petitioners' legal arguments fall into the following four broad categories: (1) Lottery rights are capital assets because they are denominated "accounts receivable" under the Florida Uniform Commercial Code and, as such, are not in the category "business accounts receivable" so as to be excluded from the statutory definition of capital asset under section 1221(a)(4);

(2) the substitute for ordinary income doctrine (doctrine) has been misinterpreted by the courts with respect to its origins and application to the sale of a lottery right; (3) to the extent that the substitute for ordinary income doctrine continues to have vitality, the Supreme Court's holding in Ark. Best Corp. v. Commissioner, 485 U.S. 212 (1988) (Arkansas Best), by establishing a definitive analysis or test has limited the effect of the doctrine so that lottery rights would not come within the reach of the doctrine; and (4) a lottery right falls within the definitions of a "debt instrument" and a "bond" under sections 1275 and 1286, respectively. Consequently, the sale of a lottery right would result in capital gain.

Respondent points out that the premise underlying petitioners' contentions is that the right to receive future lottery payments is "considered 'property' under certain provisions of Federal and state law * * * [and that therefore] the right must be considered 'property' for purposes of * * * [section 1221)(a)]"; i.e., a capital asset. Respondent contends that petitioners' premise "has been squarely rejected by every Federal court which has considered the issue."

Petitioners recognize that they are swimming against a rising tide of precedent. However, they remain undaunted and have strongly urged us to reconsider our holdings and those of

three Federal Courts of Appeals.  We proceed to consider their arguments.

Background/Case Development--A large part of this Court's analysis in prior opinions focused on whether a taxpayer's right to receive future annual lottery payments constitutes a capital asset within the meaning of section 1221.  Generally, respondent acknowledges that the definition of "capital asset" in section 1221[2] is broad and that the right to receive future annual lottery payments is a property right.  Respondent, however, relying on an established line of cases,[3] contends that the property we consider should not be treated as a capital asset or taxed at the preferred capital gain tax rate.  Other taxpayers have generally countered respondent's position by contending that the Supreme Court's opinion in Arkansas Best in some manner obviated or lessened the effect of the line of cases respondent relies on.  This Court has consistently held that the Supreme Court's interpretation of section 1221 in Arkansas Best did not modify the principle of the prior line of cases as applicable to

[2] Sec. 1221 broadly defines the term "capital asset", as follows:  "For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include".  None of the exceptions listed in sec. 1221 appears to be directly relevant to the type of property we consider here.

[3] United States v. Midland-Ross Corp., 381 U.S. 54 (1965); Commissioner v. Gillette Motor Transp., Inc., 364 U.S. 130 (1960); Commissioner v. P.G. Lake, Inc., 356 U.S. 260 (1958); Hort v. Commissioner, 313 U.S. 28 (1941).

the question of whether the sale of the right to receive future annual lottery payments is entitled to capital gain treatment.[4]

Three Federal Courts of Appeals have also held that taxpayers are not entitled to capital gain treatment on gain from the sale of their right to receive future annual lottery payments. In United States v. Maginnis, 356 F.3d 1179 (9th Cir. 2004), the Court of Appeals for the Ninth Circuit affirmed the District Court's holding that the sale of a right to receive future annual lottery payments was taxable as an ordinary income transaction. The Court of Appeals, after acknowledging that the section 1221 definition of "capital asset" was broad and seemed all encompassing, held that Congress did not intend certain property to be included in that definition. As an example, the court explained that an employee's right to be paid for work to be performed in the future was not intended to be taxed as a capital asset. The court also explained that the broad definition of section 1221 would permit taxpayers to treat most assets as capital. To avoid this, the Court of Appeals referenced

> a series of cases that have established what is commonly known as the "substitute for ordinary income" doctrine, [where] the Supreme Court has narrowly construed the term

---

[4] For petitioners' 2000 tax year, the maximum capital gain rate was 20 percent, whereas the maximum ordinary income rate was 39.6 percent. Obviously, the almost doubled rate for ordinary income has motivated taxpayers to seek capital gain treatment.

> capital asset when taxpayers have made
> transparent attempts to transform ordinary
> income into capital gain in ways that
> undermine Congress' reasons for
> differentially taxing capital gains. * * *

Id. at 1182. After further discussion of the substitute for
ordinary income doctrine, the Court of Appeals held that the sale
of the right to receive future annual lottery payments was
taxable as an ordinary income transaction.

In Lattera v. Commissioner, 437 F.3d 399 (3d Cir. 2006),
affg. T.C. Memo. 2004-216, the Court of Appeals for the Third
Circuit agreed with the result in and generally followed the
Court of Appeals for the Ninth Circuit's rationale in United
States v. Maginnis, supra. The Court of Appeals for the Third
Circuit also analyzed the effect of the Supreme Court's holding
in Arkansas Best and whether the substitute for ordinary income
doctrine survived the Supreme Court's holding. The Court of
Appeals, to address a perceived weakness in the Maginnis
analysis, performed a several-part analysis drawn from its
understanding of the analysis performed in the line of cases that
provided the basis for the substitute for ordinary income
doctrine. That more detailed analysis led the Court of Appeals
to the conclusion that gain from the sale of the right to receive
future annual lottery payments is taxable as ordinary income.

The Court of Appeals for the Tenth Circuit recently affirmed
two of this Court's decisions to like effect. The Court of

Appeals relied on the substitute for ordinary income doctrine, the same doctrine as had been invoked by the Courts of Appeals for the Ninth and Third Circuits.  See Watkins v. Commissioner, 447 F.3d 1269 (10th Cir. 2006), affg. T.C. Memo. 2004-244; Wolman v. Commissioner, 180 Fed. Appx. 830 (10th Cir. 2006), affg. T.C. Memo. 2004-262.

With that background, we proceed to evaluate each of petitioners' arguments.  Although petitioners' arguments fall into four general categories, we need address only three of them.  Their argument that lottery rights are "accounts receivable" under the Florida law so as to be property rights and included in the section 1221 definition of a capital asset need not be addressed.  That argument is part of petitioners' attempt to include the rights they sold within the definition of "capital asset".  Petitioners go to great lengths to build a syllogism by means of premises that State law defines lottery rights as property and/or that such rights are assignable.  Assuming arguendo that petitioners are correct, the application of the doctrine obviates the need to address that question.  Although State law may define the nature or ownership of property, Federal law addresses the incidence of Federal tax.  See Aquilino v. United States, 363 U.S. 509 (1960); United States v. Bess, 357 U.S. 51 (1958).  The substitute for ordinary income doctrine caselaw, applying a substance over form approach, is

determinative of whether gains from the sale of such property will be taxed as ordinary or capital gain income. Petitioners question whether the substitute for ordinary income doctrine should apply to their circumstances. They contend that the doctrine is the sole legal impediment that could prevent their right to future lottery payments from qualifying for capital gain treatment.[5]

The basic principle of the doctrine was expressed in Commissioner v. P.G. Lake, 356 U.S. 200, 266 (1958):

> The substance of what was assigned was the right to receive future income. The substance of what was received was the present value of income which the recipient would otherwise obtain in the future. In short, consideration was paid for the right to receive future income, not for an increase in the value of the income-producing property.

Stated another way: if a taxpayer merely transfers for consideration the right to receive ordinary income in the future, the right transferred will not be treated as a capital asset.

Petitioners attempt to limit application of the doctrine to the following four fact patterns derived from the seminal cases and contend that none of them applies to their situation: (1) Carve-outs in which the taxpayer retains an interest in the asset, citing Hort v. Commissioner, 313 U.S. 28 (1941), and

---

[5] Petitioners' argument assumes that the right to receive future lottery installment payments does not fit within any of the exceptions listed in sec. 1221 that would take it out of the definition of a "capital asset".

Commissioner v. P.G. Lake, Inc., 356 U.S. 260 (1958); (2) a situation where no sale or exchange occurred (such as a condemnation or taking), citing Commissioner v. Gillette Motor Transp., Inc., 364 U.S. 130 (1960); (3) a situation where a portion of the sale price of a debt instrument represents original issue discount, citing United States v. Midland-Ross Corp., 381 U.S. 54 (1965); and (4) the sale of a right to receive payment in return for a taxpayer's personal services (petitioners provided no specific citation for this situation).

Petitioners contend that their situation does not fit within those specific situations, and therefore the doctrine does not apply to them. Respondent, on the other hand, contends that the doctrine is a general principle that would apply to situations where the property in question involved "a claim or right to ordinary income." Respondent, contrary to petitioners, contends that Arkansas Best did not obviate or limit that principle (as espoused in the above-referenced pre-Arkansas Best Supreme Court holdings).

The Arkansas Best opinion is a major point of contention in the parties' arguments. Petitioners contend that the Supreme Court, in attempting to clarify the interpretation of the term "capital asset" that had evolved from the holding in Corn Prods. Refining Co. v. Commissioner, 350 U.S. 46 (1955), decided that the five categories of property excluded from capital gains

status, as set forth in section 1221, are exhaustive and not illustrative.  Petitioners also contend that Arkansas Best admonishes courts not to fashion additional exceptions to those expressed in section 1221.  See Ark. Best Corp. v. Commissioner, 485 U.S. at 217.

Both parties, to some extent, focus on the following footnote in Arkansas Best:

> Petitioner mistakenly relies on cases in which this Court, in narrowly applying the general definition of "capital asset," has "construed 'capital asset' to exclude property representing income items or accretions to the value of a capital asset themselves properly attributable to income," even though these items are property in the broad sense of the word. United States v. Midland-Ross Corp., 381 U.S. 54, 57 (1965).  See, e.g., Commissioner v. Gillette Motor Co., 364 U.S. 130 (1960) ("capital asset" does not include compensation awarded taxpayer that represented fair rental value of its facilities); Commissioner v. P.G. Lake, Inc., 356 U.S. 260 (1958) ("capital asset" does not include proceeds from sale of oil payment rights); Hort v. Commissioner, 313 U.S. 28 (1941) ("capital asset" does not include payment to lessor for cancellation of unexpired portion of a lease).  This line of cases, based on the premise that § 1221 "property" does not include claims or rights to ordinary income, has no application in the present context. Petitioner sold capital stock, not a claim to ordinary income.

Id. n.5.  Petitioners construe the Supreme Court's statements in that note as "pure dicta" with respect to the application of the doctrine because of the seminal holding of Arkansas Best giving effect to the express terms of section 1221.  Respondent contends that the footnote indicates that the Supreme Court did

not intend to limit the application of the substitute for ordinary income doctrine by the <u>Arkansas Best</u> holding.

This Court and three Courts of Appeals have consistently held that the substitute for ordinary income doctrine was not obviated by the holding in <u>Arkansas Best</u>. No court has attempted to express a bright-line rule defining which property rights might represent substitutes for ordinary income. Each has expressed the difficulties that exist in attempting to draw a bright line. Only one thing becomes clear in these analyses--the process of defining which property or property rights fit within the substitute for ordinary income doctrine is ad hoc and fact specific. Given that the doctrine has not been obviated or limited, we see no reason to depart from the established and uniform precedent. We, accordingly, proceed to decide whether the factual circumstances of the case we consider fall within the doctrine's embrace.

Initially, we reject petitioners' attempt to limit the application of the doctrine to four general factual categories. Neither the holding nor the rationale of the Supreme Court in <u>Arkansas Best</u> changed the underlying principle of the substitute for ordinary income doctrine. Although the <u>Arkansas Best</u> holding was intended generally to define "capital asset" in accordance with the statute, as reflected in note 5 of the <u>Arkansas Best</u> opinion, there was no intent to change or modify the holdings of

the line of cases establishing the substitute for ordinary income doctrine. Accordingly, petitioners' reliance on <u>Arkansas Best</u> for a limited approach to the doctrine must fail.

There can be no doubt that petitioners' lottery installment payments were ordinary income. As those payments were received, petitioners treated them as ordinary income on their returns before selling the remaining right to future payments. Under the principle of the doctrine, the sale of the remaining right to the ordinary income payments did not cause their conversion to a capital asset.

Petitioners also argue that Congress intentionally limited the exceptions to the definition of "capital asset" in section 1221 for policy reasons. Petitioners believe that the definition was intended to create a dichotomy between business transactions and transactions in property. We cannot accept the incongruous result of petitioners' premise; i.e., that Congress intended to allow the conversion of gambling winnings to capital gain by the simple expedient of a sale of the right to future installments by the lottery winner.

Petitioners also argue that lottery rights have been labeled or treated as property in Federal caselaw. Petitioners cite cases where lottery rights were treated as property for purposes of bankruptcy, domestic relations, estate tax, gift, etc. That, however, does not convert ordinary income to capital gain. The

doctrine trumps the fact that lottery rights may be considered property for purposes other than deciding whether gain from their sale is taxable at preferential capital gain rates. The courts have unanimously agreed that preferential tax rates are not applicable to the sale of the right to future lottery payments.

Petitioners also attempt to construe the true meaning of the seminal cases underlying the doctrine in their endeavor to show that the holdings of those cases were not intended to include the type of factual situation we consider here. In their analysis, petitioners reach deep into the foundations of Federal tax law, drawing upon cases, such as Lucas v. Earl, 281 U.S. 111 (1930), and metaphorical language, such as "fruit/tree" and "horizontal slice/vertical slice", to make their point that the right to lottery payments should not be snared in the substitute for ordinary income net. There is nothing in those opinions that would support petitioners' suppositions. In the face of an extensive body of caselaw, petitioners' arguments are unconvincing and without substance.

Petitioners' final argument is that lottery rights are analogous or akin to debt instruments, such as State bonds. Petitioners seek solace in the definition of a "debt instrument" set forth in sections 1275(a)(1)(A) and 1286. Although petitioners may be able to show some factual similarity between a right to future lottery payments and debt instruments, we are

unpersuaded that those statutes and definitions have any relevance to the question we consider. In addition, even if they are analogous, petitioners' intent is to show that such definitions support their argument that lottery rights are capital assets within the meaning of section 1221. As we have already observed, the substitute for ordinary income doctrine applies to the lottery rights petitioners sold irrespective of whether they may be comparable to the categories defined in section 1221 as capital assets. See also <u>United States v. Maginnis</u>, 356 F.3d at 1187 n.10.

We have considered petitioners' remaining arguments. Because of the extensive precedent to the contrary, there is no need for any additional discussion in this opinion.

To reflect the foregoing,

<u>Decisions will be entered for</u> <u>respondent in docket No. 13434-03 and</u> <u>under Rule 155 in docket No. 19829-03.</u>