**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES F. ALDERSON; CONNIE B.
ALDERSON; JENNIFER A. PAGE;
WALTER PAGE; JUSTIN W.
ALDERSON; KRISTEN N. ALDERSON,
            *Plaintiffs-Appellants,*

            v.

UNITED STATES OF AMERICA,
            *Defendant-Appellee.*

No. 10-56007

D.C. No.
2:09-cv-06155-
SVW-MLG

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted
January 12, 2012—Pasadena, California

Filed July 18, 2012

Before: Stephen Reinhardt and William A. Fletcher,
Circuit Judges, and Jack Zouhary, District Judge.*

Opinion by Judge William A. Fletcher

---

*The Honorable Jack Zouhary, United States District Judge for the
Northern District of Ohio, sitting by designation.

## COUNSEL

Robert W. Wood, David B. Porter, Steven E. Hollingworth, WOOD & PORTER, P.C., San Francisco, California, for the appellants.

Thomas D. Coker, OFFICE OF THE UNITED STATES ATTORNEY, Los Angeles, California, Damon W. Taaffe, Kenneth L. Greene, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for the appellee.

**OPINION**

W. FLETCHER, Circuit Judge:

In 1993, James Alderson filed a *qui tam* action under the False Claims Act ("FCA") alleging Medicare fraud by Quorum Health Group, Inc. ("Quorum"), a hospital management company, and several related entities including the Hospital Corporation of America, Inc. ("HCA"). The United States intervened in 1998. The United States settled its FCA claims against HCA for $631 million in 2003. Alderson received sixteen percent of the settlement as his relator's share.

Alderson and related taxpayers, Appellants, filed income tax returns for tax year 2003 reporting the relator's share as ordinary income. They later filed amended returns characterizing it as capital gain, seeking refunds of about $5 million. The Internal Revenue Service ("IRS") denied the refund claims. Appellants then filed suit in federal district court. The court granted summary judgment to the United States, holding that the relator's share was ordinary income. *Alderson v. United States*, 718 F. Supp. 2d 1186, 1200-01 (C.D. Cal. 2010).

We affirm.

## I.    Background

Alderson was the Chief Financial Officer for North Valley Hospital in Whitefish, Montana, in 1990. That year, Quorum, an affiliate of HCA, began managing the hospital. Quorum asked Alderson to prepare two sets of books, one for the hospital's financial auditors and one to serve as the basis for the hospital's Medicare cost reports. Alderson refused to prepare separate books. Quorum fired him in September 1990.

In May 1991, Alderson filed a wrongful termination suit. During discovery, Alderson deposed several Quorum officials

and obtained sample Medicare cost reports. The depositions and documents suggested widespread accounting fraud. *See United States ex rel. Alderson v. Quorum Health Grp. Inc. (Quorum)*, 171 F. Supp. 2d 1323, 1325 (M.D. Fla. 2001). Alderson settled his wrongful termination suit in 1993.

Using information obtained during discovery in his wrongful termination suit, Alderson filed a pro se *qui tam* suit in January 1993 against Quorum, HCA and affiliated companies under the False Claims Act. *See* 31 U.S.C. §§ 3729 *et seq*. At that time, Alderson made available to the United States the documents he had received during discovery. In a subsequent conversation between Alderson and the Department of Justice, Alderson "identified for . . . government personnel the categories of documents that the government should subpoena from Quorum to advance most effectively the government's investigation." *Quorum*, 171 F. Supp. 2d. at 1326. The United States issued subpoenas that resulted in the production of cost reports from 197 hospitals covering a seven-year period. *Id.* At the government's request, Alderson analyzed the reports and prepared a spreadsheet for the government based on 2,500 documents. Alderson presented his analysis to the government in early 1995. *Id.*

Alderson spent five years trying to persuade the United States to intervene in his FCA suit. At his own expense, he retained counsel in 1993, and different counsel in 1995, to represent him. *Id.* The United States finally intervened in 1998. *Id.* at 1329. After intervening, the United States severed the suits against HCA and Quorum. *Id.* The district court opinion in the severed Quorum suit describes in detail Alderson's extensive efforts on behalf of the United States. *Id.* at 1326-31.

In 2001, the United States settled the suit against Quorum for $85.7 million. Alderson received a twenty-four percent relator's share, one percent below the maximum percentage allowed under the *qui tam* statute. 31 U.S.C. § 3730(d)(1). In

explaining its decision to award Alderson a significant share of the recovery, the district court referred to the "heroic effort by many, including prominently Alderson and the team he assembled, [that] contributed to the development of the factual information, documentary evidence, and legal arguments necessary to prevail." *Quorum*, 171 F. Supp 2d. at 1332. The appropriate tax treatment of Alderson's relator's award in the Quorum suit is not before us.

In 2003, the United States settled the suit against HCA for $631 million. Alderson received a sixteen percent relator's share. After accounting for attorney's fees and expenses, Alderson received $27,105,035. We are asked to determine the appropriate tax treatment of this award.

Prior to the settlement of the HCA suit, Alderson gave portions of his potential relator's share to members of his family, using a family partnership he established for this purpose. Alderson transferred to the Alderson Family Limited Partnership ("the partnership") forty percent of his interest in the relator's share. Alderson retained ownership of the remaining sixty percent of his relator's share. Alderson gave each of his two children, Justin and Jennifer, a forty-nine percent interest in the partnership. He gave his wife Connie a one percent interest in the partnership and retained a one percent interest in the partnership in his own name. In 1999, an appraiser estimated the present value of the entire relator's share as $3,047,356. The appraiser used that estimate to value the partnership shares. Alderson and his wife relied on this valuation to pay a gift tax on the partnership shares transferred to their children.

In 2003, the Alderson parties received their relator's share income and filed tax returns for tax year 2003 reporting their share of the settlement. James and Connie Alderson filed a joint return reporting income from the sixty percent ownership interest that Alderson had retained and from their two percent interest in the partnership. Justin Alderson and his

wife Kristen, and Jennifer Alderson Page and her husband Walter Page, reported on their joint returns the partnership income they received based on Justin's and Jennifer's forty-nine percent interests in the partnership. All three couples characterized the income as ordinary income.

In 2007, all three couples filed amended returns for tax year 2003, in which they re-characterized their portions of the relator's share as capital gain. This re-characterization, if upheld, would significantly reduce their tax liability for 2003. Alderson and his wife sought a refund of $3,263,431. His two children and their spouses each sought just over one million dollars per couple.

The IRS denied the refund requests in 2008. All three couples then filed suit in district court for refunds. The district court held that the relator's share was ordinary income and granted summary judgment to the United States. *Alderson*, 718 F. Supp. 2d at 1200-01. The three couples timely appealed.

## II.  Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. § 1291. We review a grant of summary judgment *de novo*. *Red Lion Hotels Franchising, Inc. v. MAK, LLC*, 663 F.3d 1080, 1086 (9th Cir. 2011). "The taxpayer bears the burden of establishing that proceeds of a settlement are what the taxpayer contends them to be." *Milenbach v. Comm'r*, 318 F.3d 924, 933 (9th Cir. 2003).

## III.  Discussion

### A.  False Claims Act

**[1]** The False Claims Act imposes civil liability on any person who presents to the federal government "a false or fraudulent claim for payment or approval." 31 U.S.C.

§ 3729(a). The government may itself bring a suit, or a private person may bring a suit in the name of the government as a "relator." § 3730(a), (b)(1). If a private person wishes to bring suit, the relator must first serve on the government a copy of the complaint, together with supporting evidence. § 3730(b)(2). The government then has at least sixty days to decide whether to intervene in the suit. *Id.* While the government is deciding whether to intervene, the complaint must remain under seal in the district court and may not be served on the defendant until the court so orders. § 3730(b)(2). If the government declines to intervene, the relator may pursue the suit on his or her own. § 3730(b)(4)(B).

**[2]** If the government declines to intervene and the relator succeeds in obtaining a judgment, the relator is entitled to receive between twenty-five and thirty percent of the recovery, plus fees and costs. § 3730(d)(2). If the government intervenes and if a judgment is not based primarily on information that was already public, the relator is entitled to receive between fifteen and twenty-five percent of the recovery, plus fees and costs. § 3730(d)(1). If the government intervenes and the judgment is "based primarily" on disclosures made in government hearings or reports, or in news reports, the relator is entitled to receive between zero and ten percent of the recovery, plus fees and costs. *Id.* The percentage awarded to the relator depends "upon the extent to which the [relator] substantially contributed to the prosecution of the action." *Id.* In the suit against HCA, where the judgment was not based primarily on public information, Alderson received a sixteen percent relator's share.

**[3]** The Supreme Court has characterized a relator's share under the FCA as a "bounty" and as a "fee." The Court observed in *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 772, that "the relator's bounty is simply the fee he receives out of the United States' recovery for filing and/or prosecuting a successful action on behalf of the Government." *Id.* at 772 (emphasis omitted).

The Court further referred to the relator's share as "the bounty [the relator] will receive if the suit is successful," *id.*, and to the *qui tam* suit as "the relator's suit for his bounty." *Id.* at 773.

## B. Ordinary Income Versus Capital Gain

**[4]** Whether a relator's share under the FCA is ordinary income or capital gain is a question of first impression. Appellants cite no case in which a relator's share has been given capital gains treatment. The government states that it is "unaware of a single instance in which a relator's award has received capital gains treatment." However, the government provided no case supporting the proposition that such awards have been consistently treated as ordinary income and has cited no case addressing the question.

### 1. Section 1222

Section 1222 of the Internal Revenue Code defines "capital gain" as "gain from the sale or exchange of a capital asset." 26 U.S.C. § 1222(1), (3). We consider, in turn, the requirements of "sale or exchange" and "capital asset."

#### a. Sale or Exchange

**[5]** Capital gains treatment applies only to a "gain from [a] sale or exchange." *Id.* Appellants contend that "Alderson exchanged his documents, information and know-how[ ] and . . . received cash, thus consummating a sale or exchange . . . ." (For convenience, we will refer to the documents, information, and know-how provided by Alderson as "information.") We disagree with Appellants' contention.

**[6]** Alderson did not "sell" or "exchange" his information. Alderson's right to a relator's share was a right conferred by the FCA. He provided his information to the government as a precondition for pursuing his *qui tam* suit, as required by the

statute. If Alderson had offered simply to sell or exchange the information to the government in return for a sum of money, the government would almost certainly have refused the offer. In the unlikely event the government had accepted the offer, it would have done so based on some authority other than the FCA.

Further, Alderson did far more than simply hand information over to the government. As detailed by the district court in *Quorum*, he performed numerous acts in connection with that information. 171 F. Supp. 2d at 1326-31. He spent five years after filing his pro se complaint trying to persuade the government to intervene in his suit. Among other things, he performed an extensive analysis of 2,500 documents the government had obtained through subpoenas, and he prepared a spreadsheet based on that analysis. *Id.* at 1326. He also retained his own counsel—indeed, two different counsel—during these five years to help him in his effort to persuade the government to intervene. *Id.*

Appellants contend that "Tax Court decisions and IRS rulings alike make clear that a sale or exchange is not a prerequisite for capital treatment." It is true that damage to a capital asset may, in some circumstances, qualify for capital gains treatment. *See, e.g.*, *Inco Electroenergy Corp. v. Comm'r*, T.C. Memo 1987-437 ("[A]mounts received for injury or damage to capital assets are taxable as capital gain, whereas amounts received for lost profits are taxable as ordinary income." (citing *State Fish Corp. v. Comm'r,* 48 T.C. 465, 472 (1967))). But Appellants point us to no case treating actions such as those performed by Alderson in return for his relator's share under the FCA as a "sale or exchange."

### b.    Capital Asset

**[7]** Section 1221(a) defines a capital asset as "property held by the taxpayer," subject to certain exceptions not relevant here. 26 U.S.C. § 1221(a). In 1960, the Supreme Court

wrote, "This Court has long held that the term 'capital asset' is to be construed narrowly,' in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time . . . ." *Comm'r v. Gillette Motor Transp., Inc.*, 364 U.S. 130, 134 (1960). Appellants have two theories. First, they argue that the information supplied by Alderson to the government was a capital asset. Second, they argue that the relator's share itself was a capital asset.

**[8]** Under their first theory, Appellants must show that the information Alderson provided to the government was his "property," as required by § 1221(a). Information and papers are often protected property rights. *See, e.g.*, *United States v. Frazell*, 335 F.2d 487, 490 (5th Cir. 1964) (holding a set of unique and valuable maps to be a capital asset); *E.I. du Pont de Nemours & Co. v. United States*, 288 F.2d 904, 912 (Ct. Cl. 1961) (discussing trade secrets as capital assets). However, the information Alderson provided to the government was not his property.

General principles of property law require that a property owner have the legal right to exclude others from use and enjoyment of that property. *See G.S. Rasmussen & Assoc., Inc. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896, 903 (9th Cir. 1992) (defining three characteristics of property: (1) "an interest capable of precise definition"; (2) an interest "capable of exclusive possession or control"; and (3) "the putative owner must have established legitimate claim to exclusivity").

**[9]** Alderson had no legal right to exclude others from use of the information that he obtained through discovery and subsequently provided to the government. The information was known to other officials in the company, and Alderson had no right to prevent those officials from providing it to others. The FCA required Alderson to file his complaint and accompanying evidence under seal to allow the government

to examine it, *see* 31 U.S.C. § 3730(b)(2), but that requirement does not alter the fact that Alderson could not prevent others who knew the information from revealing it to the government or to *The New York Times*.

Under their second theory, Appellants contend that Alderson's relator's share, rather than the information he provided in order to obtain it, was a capital asset. Appellants contend that the increase in value of the relator's share between 1993, when Alderson filed his suit, and 2003, when he actually received his relator's share of $27,105,035, was capital gain.

**[10]** We recognize that a relator's share—even a potential relator's share—can be property for some purposes. For example, a potential relator's share can be assigned to others, as Alderson did when he assigned part of his share to his wife and children. But the fact that a relator's share can be property for some purposes does not make it a capital asset under § 1221(a).

Appellants rely on two community property cases in an attempt to support their second theory. *See D.B. v. K.B.*, 176 S.W.3d 343, 349 (Tex. Ct. App. 2004); *In re Marriage of Biddle*, 52 Cal. App. 4th 396, 400 (1997). While a relator's share can be community property, the definition of community property is much broader than the definition of a capital asset under § 1221(a). Community property includes many types of ordinary income, such as wages earned during marriage. Indeed, the two cases cited by Appellants describe the relator's share in terms applicable to ordinary income rather than capital gain. *See D.B.*, 176 S.W.3d at 349 (noting that relator "earned the fee by discovering the fraud, filing the *qui tam* lawsuit, and providing the United States Attorney's Office with information"); *Biddle*, 52 Cal. App. 4th at 400 (comparing work of *qui tam* relator to "that of a married producer who starts work on a movie and, after separating from her husband, completes the movie which becomes a smash hit; the

contingency of success results in a divisible community asset").

Appellants also rely on *United States v. Maginnis*, 356 F.3d 1179, 1183 (9th Cir. 2004), in support of their second theory. In *Maginnis*, we set forth two factors that may, in some circumstances, be used to identify a capital asset. The two factors are (1) whether the taxpayer made an "underlying investment of capital in return for the receipt of his . . . right," and (2) whether "the sale of his right . . . reflect[ed] an accretion in value over cost to any underlying asset." *Id.* Appellants contend that the increase in value between 1993 and 2003 satisfies both *Maginnis* factors. We conclude that they satisfy neither.

[11] First, Alderson did not receive his right to a relator's share in return for an "underlying investment of capital." Appellants state in their brief, "Alderson acquired property when he uncovered HCA's secret accounting practices, when he received documents stamped 'Confidential—Do not discuss or release to Medicare auditors,' and when he applied his cost accounting expertise to interpret and explain them." Uncovering accounting fraud, receiving documents during discovery, and interpreting those documents are not activities that constitute an investment of capital. Appellants point out that Alderson incurred expenses in acquiring the documents and information that he provided to the government. However, the fact that Alderson incurred expenses is not determinative, for taxpayers routinely incur expenses in the production of ordinary income.

[12] Second, the increase in value between 1993 and 2003 did not "reflect an accretion in value over cost to [the] underlying asset." The increase in value of Alderson's relator's share—of his "underlying asset"—was not the sort of "accretion in value" that characterizes a capital gain. Alderson was not an investor who bought and held an asset that increased in value during the holding period. Rather, Alderson worked

intensively after 1993 to increase the likelihood that his qui tam suit would be successful, as the district court in *Quorum* recounted in detail. 171 F. Supp. 2d at 1326-31.

### 2.    Section 1234A

Finally, Appellants contend that the increase in value between 1993 and 2003 is a capital gain under 26 U.S.C.§ 1234A. That section provides:

> Gain or loss attributable to the cancellation, lapse, expiration, or other termination of a right or obligation with respect to property . . . which is a capital asset in the hands of the taxpayer . . . shall be treated as gain or loss from the sale of a capital asset.

This provision does not help Appellants. It applies only to such "[g]ain or loss . . . with respect to property which is a *capital asset* in the hands of the taxpayer." *Id.* As discussed above, Alderson's right to his relator's share was not a capital asset.

### Conclusion

**[13]** We hold that Alderson's *qui tam* award under the FCA was ordinary income. We therefore affirm the district court's grant of summary judgment in favor of the government.

**AFFIRMED.**